201 So.2d 855

**SPRINGDALE GAYFER'S STORE
CO., Inc., et al.**

v.

**D. H. HOLMES CO., Ltd., et al.**

1 Div. 259.

Supreme Court of Alabama.

Aug. 17, 1967.

268

Marion Rushton, of Rushton, Stakely &
Johnston, Montgomery, Robt. T. Cunning-

ham, of Cunningham & Bounds, Mobile, for appellants.

John L. Toler, of Chaffee, McCall, Phillips, Burke, Toler & Hopkins, New Orleans, La., Robt. C. Black and Thos. B. Hill, Jr., of Hill, Hill, Stovall & Carter, Montgomery, for appellee, D. H. Holmes Co., Ltd.

T. Massey Bedsole of Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, for appellees, Springdale Stores, Springdale Plaza and Delaney.

COLEMAN, Justice.

Complainants appeal from a decree dismissing their bill of complaint after separate demurrers of respondents had been sustained to the bill as last amended. Complainants say that the bill had equity and, therefore, that the court erred in sustaining demurrers which were addressed to the bill as a whole.

*Statement of the case.*

Complainants are two corporations, namely: Springdale Gayfer's Store Co., Inc., an Alabama corporation, hereafter called Gayfer's; and The Northwestern Mutual Life Insurance Company, a Wisconsin corporation, hereafter called Northwestern.

Respondents are a resident of Alabama named E. E. Delaney and three corporations, namely: Springdale Stores, Inc., a Mississippi corporation, hereafter called Springdale Stores; Springdale Plaza, Inc., an Alabama corporation, hereafter called Springdale Plaza; and D. H. Holmes Co., Ltd., a Louisiana corporation, hereafter called Holmes.

This suit concerns the use of a tract of land consisting of seven connected forty-acre parcels as shown on the map or plat here set out. The purpose of the suit is to prevent Holmes from operating a department store on the 7.9–acre parcel of the land which is marked HOLMES.

Complainants allege that on May 13, 1953, Delaney Realty Co., Inc., an Alabama corporation, purchased the entire tract which contains approximately 270 acres; that by deed dated November 30, 1953, Delaney Realty Co., Inc. conveyed the 270–acre tract to Southern Furniture Manufacturing Co., Inc., a Mississippi corporation, whose name has been changed to Springdale Stores; that by deeds dated October 19, 1953, and April 10, 1956, Southern Furniture Manufacturing Co., Inc. conveyed to Springdale Plaza a part of the 270–acre tract which lies in the northeast corner of the intersection of the interstate highway and Government Street Road. The part thus conveyed to Springdale Plaza contains approximately forty acres, is shown on the above plat as fronting on the highway and road, and is that part of the plat enclosed within the hatched boundary lines. This 40–acre tract is sometimes called the Springdale Plaza Shopping Center.

Complainants allege that by written agreement dated December 27, 1955, Gayfer's agreed to purchase from Springdale Plaza that portion of Springdale Plaza's forty acres which is marked "GAYFERS" on the plat, which contains 10.37 acres, and whose shape on the plat resembles the letter Y; that said agreement provided that Springdale Plaza, its successors and tenants would not, without Gayfer's written consent, enter into leases with Holmes; that Gayfer's subsequently purchased the 10.37–acre tract; that prior to October 28, 1958, Gayfer's sold the 10.37–acre tract to Northwestern; and that Northwestern leased the tract to Gayfer's for a primary term of twenty-five years with certain renewal options.

Complainants further allege that, on October 28, 1958, Gayfer's, Springdale Plaza, and Northwestern entered into an agree--

ment, which was recorded in the office of the Judge of Probate on December 22, 1958, a copy of which is attached to and made a part of the bill of complaint; that the agreement provided, in substance, that Springdale Plaza, its successors, grantees, and tenants would not, without written consent of the other two parties to the agreement, enter into leases with Holmes, its subsidiaries or affiliates.

Complainants allege that, at the time of execution of the 1958 agreement, it was "the intent, desire and agreement of all the parties" thereto that Holmes was not to be allowed to acquire the right to use or occupy or acquire any interest in the 270–acre tract so long as tenants occupying the Gayfer's 10.73–acre parcel operate a store in the Springdale Plaza Shopping Center.

Complainants aver that the 1958 agreement "does not expressly limit the area the prohibitions of Paragraph 6 of said agreement were to cover," but the parties intended and agreed that the prohibitions were to cover "all property" owned by Delaney and by any corporations controlled by him, which would include the entire 270–acre tract, and the parties intended and agreed "that such provisions should be reduced to writing and incorporated in the" agreement; that during the time Gayfer's was negotiating with Delaney relative to putting a department store on the 270–acre tract, he was acting not only for himself but also as President and on behalf of all respondents except Holmes; that, during said negotiations, Delaney was informed that the property was low and swampy; that to build the store he desired would be costly and it would be necessary for Gayfer's to expend "ex(c)eptionally large sums of money in advertising to promote its store and the center as a whole"; that he was informed by Gayfer's that the shopping center on the Springdale Plaza property could not prosper without having a major store of the type to be operated by Gayfer's located therein; that Delaney acknowledged that he knew that such a store would be the prime attraction and essential element to at-

tract other tenants; that it is customary in such shopping centers to make concessions to the major store tenant and this was discussed with Delaney; that Gayfer's agreed to provide such store facility without cost to the owner and to share proportionally in the cost of the common facilities, and, in consideration of such agreement, Delaney agreed that Holmes would not be permitted to operate in competition "with it"; that "With this fully understood and agreed upon by all the parties thereto, Paragraph 6 was included in said Three Party Shopping Center Agreement. Paragraph 6 of said Three Party Shopping Center Agreement *purposely did not expressly limit the area which the prohibitions contained therein were to cover,* it being understood and agreed by all the parties thereto that said prohibitions would cover all of the land owned or controlled by E. E. Delaney and the other Respondents" except Holmes; that "In agreeing upon said prohibitions *the Complainants were well aware that E. E. Delaney and the other Respondents * * ** (except Holmes) *owned or controlled the adjacent land"* (Emphasis Supplied) in the 270–acre tract, and that Paragraph 6 of the agreement, if limited to the 40–acre Springdale Plaza tract, would be of no protection to complainants unless it covered such adjacent property in view of the fact that complainants' store building was to be located in close proximity to the adjoining land so owned and controlled.

Complainants aver that at the time of execution of the agreement, the parties thereto discussed the probability of other stores being attracted to the area and parking problems arising therefrom; that they discussed the detrimental effect heavy industry would have on a department store; that, to provide for these contingencies, Section 13 and Section 3(b) were added to the agreement, it being the intent and agreement of the parties that complainants' store and other stores should not be faced with a parking area shortage due to available parking space being used by customers of other stores, and that the success of

"their store" and other tenants would not be jeopardized by heavy industry moving into the area; that the parties intended and agreed that all restrictive agreements were to apply to the entire 270–acre tract.

Complainants aver that the name of Southern Furniture Manufacturing Co., Inc., was changed to Springdale Stores, Inc.; that on November 12, 1963, Springdale Stores sold to Holmes the 7.9–acre HOLMES tract shown on the plat; on information and belief, that prior to November 12, 1963, complainants were informed that Holmes was negotiating with Delaney relative to leasing property, in the vicinity of the Springdale Plaza Shopping Center, from Delaney; that, immediately, Holmes and Springdale Plaza were given notice, by letters dated October 25, 1963, of complainants' rights under the 1958 agreement; that, after receipt of the letters, Holmes and Springdale Stores, to avoid the 1958 agreement, made a purchase and sale instead of a lease; that Holmes is planning to construct and operate a department store on the Holmes 7.9–acre tract in violation of the agreement, and that respondents are planning further to breach the agreement as to additional parcels in the 270–acre tract.

Complainants allege that Delaney is President and "primary stockholder" of Delaney Realty Co., Inc., Springdale Stores, and Springdale Plaza; that all the above named corporations have been and are now controlled and directed by Delaney, and that they are merely instrumentalities of Delaney and have been manipulated "in such a manner as to attempt to evade the obligations of" Springdale Plaza and Delaney under the 1958 agreement.

Complainants pray that the court enjoin Springdale Stores, Springdale Plaza, their agents, officers, directors, affiliates, etc., and Delaney from selling, leasing, or conveying any part of the 270–acre tract to Holmes; that the court restrain Holmes from operating a store on the 270–acre tract; that the 1958 agreement be reformed to express the true intent of the parties by expressly providing that all restrictive provisions of the 1958 agreement apply to the entire 270–acre tract; and for general relief.

Pertinent provisions of the agreement of October 28, 1958, are as follows. The parties are Springdale Plaza, Gayfer's, and Northwestern. Springdale Plaza and Gayfer's are parties to a certain agreement dated December 27, 1955, as amended in 1956 and 1957, pursuant to which Springdale Plaza sold to Gayfer's the 10.37–acre Gayfer's parcel situated in a proposed shopping center area shown on a plat and described by courses and distances in two exhibits attached to and made part of the agreement. The plat shows in some detail the 40–acre Springdale Plaza parcel but does not show any of the remainder of the 270–acre tract other than the highway, Government Street Road, and the interchange. The plat shows the 10.37 Gayfer's parcel which lies inside the boundaries of the 40–acre parcel, the part of Gayfer's parcel on which Gayfer's is to build, other adjoining areas on which Springdale Plaza is to build, and parking areas. The description, by courses and distances, sets out the boundaries of the 10.37–acre Gayfer's parcel and so designates that parcel. The description then sets out the description of the boundaries of what is denominated "Seller's Parcel," which is the 40–acre Springdale Plaza parcel less and except the 10.37–acre Gayfer's parcel. Gayfer's has sold its parcel to Northwestern who has agreed to lease to Gayfer's; Springdale Plaza has made a substantial number of leases with prospective tenants, and the parties desire to specify their respective rights and obligations.

The 1958 agreement provides that it shall supersede certain parts of the prior agreement but other parts of the prior agreement are to remain in effect. We do not think that those parts of the prior agreement are otherwise set out in the bill.

The 1958 agreement further provides that Springdale Plaza will use the Seller's Parcel

for operation of a shopping center; Gayfer's agrees to operate a department store and Northwestern agrees that for 25 years it will not use or lease Gayfer's parcel except for such purposes. Specifications relating to buildings are set out. In the agreement, Springdale Plaza is referred to as Springdale.

Paragraph 3(b) of the agreement recites:

"(b) Nothing contained in this agreement shall preclude Springdale or Gayfers from building more than one floor or building a basement on the areas designated as building areas on Exhibit A. Springdale may from time to time erect additional buildings on its building area as shown on Exhibit A, but shall not erect buildings on a total area in excess of 304,000 square feet of ground floor area, which shall be within the areas marked as 'Seller's Building Area,' as shown on Exhibit A.

"Additional buildings may be erected by Springdale in either or both of the following locations:

"(i) North and/or east of the 'service driveway' at the rear of the stores herein provided for on Exhibit A in said shopping center provided that additional parking space in the proportion of 4 square feet of parking area to one square foot of building area is provided by Springdale immediately north and/or east of such additional buildings;

"(ii) West of the Belt Line Highway provided that additional parking space in the proportion of 4 square feet of parking area to one square foot of building area is provided by Springdale adjacent to such additional buildings.

"Neither Gayfers nor Northwestern Mutual may erect a building or buildings on any part of the Gayfer Parcel other than the 70,000 square feet of building area as shown on Exhibit A."

The Belt Line Highway is the same as Interstate Highway #65.

Time requirements for construction of certain required buildings are set out.

Paragraph 6, the point of controversy, recites:

"6. *Restrictions against Leasing to Certain Tenants.* Springdale hereby agrees that it and its tenants or subtenants shall not, without the written consent of Northwestern Mutual and the tenant occupying the Gayfer Parcel, enter into leases with any of the following or their subsidiaries or affiliated companies:

"\* \* \*

"D. H. Holmes (New Orleans)

"The foregoing restrictions shall continue in effect only while the tenant occupying the Gayfer Parcel conducts a department store business therein."

Paragraph 8 recites:

"8. *Restrictions on Assigning Lease or Subleasing.* Gayfers may sell the Gayfers Parcel to Northwestern Mutual pursuant to an agreement by Northwestern Mutual to lease said Gayfers Parcel back to Gayfers under a lease (hereinafter called the 'lease') providing for a primary term of 25 years with options to extend the term of the lease. If Gayfers receives a bona fide offer to purchase or sublease its leasehold interest in the Gayfer Parcel in its entirety, and it desires to accept such offer, it shall give written notice by registered mail to Springdale together with a copy of said offer. For a period of thirty days following receipt of such notice, Springdale shall have the option to purchase such leasehold interest in or sublease the said Gayfer Parcel upon the same terms and conditions as are stated in said offer, subject to the provisions of the lease. Northwestern Mutual, Gayfers and Springdale agree that they will not use, sell, lease or sublease the Gayfer Parcel for heavy industrial use or for any purpose materially detrimental and objectionable to the shopping center during its continued operation for retail merchandising purposes."

Paragraphs 12, 13, and 15 recite:

"12. *General Obligations of Springdale.* Springdale agrees to:

"(a) Permit Gayfers to examine all leases entered into with tenants in the Seller's Parcel, and furnish copies of such leases upon the request of Gayfers, for a period of 10 years after the initial opening of the Gayfers store.

"(b) Furnish to Gayfers and Northwestern Mutual the ·opinion of counsel satisfactory to Gayfers and Northwestern Mutual, that the real estate constituting the shopping center is zoned so as to permit the use of all of said premises for shopping center purposes, with buildings of the same ground floor area, size, shape and location as appear on Exhibit A.

"(c) Establish rules to be observed by tenants of the shopping center, to be incorporated by reference into the leases hereafter entered into with said tenants; such rules to be subject to the approval of Gayfers. Such rules shall cover parking by tenants and their employees, hours of operation, outside displays and obstructions, window cleaning and lighting and other related matters.

"13. *Additional Land Owned or Acquired by Springdale.* Springdale agrees that in the event it (or any of its agents, officers, directors, stockholders, subsidiaries, affiliated corporations, successors or assigns, or any other corporation or partnership in which it may have an interest) presently has or shall at any future date acquire title to or the right to use any land adjoining or on the other side of any street or road adjacent to the said Seller's Parcel and/or the said Gayfer Parcel, Springdale (and its said subsidiary or affiliate, etc.) will not permit the use of any such premises for heavy industrial use or for any purpose materially detrimental and objectionable to the shopping center, and in the event that any such land is devoted· to retail

sales or other purposes customary in: shopping centers adequate parking facilities in the ratio of at least four square feet of parking area to each one square foot of building area will be provided. The use of such premises for retail sales. or for other purposes customary in shopping centers or for residential purposes,. will not be considered as purposes materially detrimental or objectionable to the shopping center.

"\* \* \*

"15. *Agreement Binds Successors.* This agreement shall be binding upon, shall inure to the benefit of, and shall' be enforceable by each party hereto and its successors, assigns and grantees. Neither Springdale nor Gayfers shall assign its interests in this agreement without the written consent of the other."

*Opinion.*

As we understand the briefs, complainants contend that the bill contains equity because it shows that, for one or the other of two reasons, complainants have the right to enjoin the use of any part of the 270–acre tract by Holmes:

First, because the 1958 agreement as now written gives complainants that right; or

Second, if the agreement as written does not give complainants that right, then because the averments of the bill show that complainants are entitled to have the agreement reformed to give complainants that right by expressly stating that the restrictions of Paragraph 6 apply to the entire 270–acre tract.

Covenants restricting the use of property for certain business purposes appear in leases and to some extent in conveyances of land. The nature of such covenants and the reasons variously given for upholding them are discussed by Professor Reno in XXVIII Va.L.R. 951. Cases involving covenants against competition are cited in annotations in 14 A.L.R.2d 1333 and in 97 A.L.R.2d 9.

This court appears to have approved the statement that contracts in partial restraint of trade are always upheld when properly restricted as to territory, time, and persons, where they are supported by sufficient consideration. Alabama-Tennessee Natural Gas Co. v. City of Huntsville, 275 Ala. 184, 193, 153 So.2d 619.

As long ago as 1884, this court expressed the opinion that where a purchaser of warehouse property, who, at the time of purchase, had obtained the seller's promise that the seller, his executors, administrators, and assigns would not directly or indirectly ever permit or allow operation of a warehouse on certain land retained by the seller, the successors to the title of the purchaser were entitled to enforce the promise by injunction against the seller's assignee who had acquired the retained parcel with notice of the promise. The court said further that the seller's assignee; who admitted that he was informed, before the sale to him, of the existence of some such obligation; was under the duty to seek information of the nature of such obligation and was chargeable with notice of everything such inquiry would have led to. Webb v. Robbins, 77 Ala. 176. See also Johnston v. Harsh, 207 Ala. 524, 93 So. 451.

■ We are of opinion that the instant covenant against leasing to Holmes is not void as a contract in restraint of trade.

■■ We are also of opinion that the letters from complainants' attorneys to Holmes, if received by Holmes before the sale to Holmes, were sufficient to put Holmes on inquiry as to the restriction against leasing to Holmes which was contained in the 1958 agreement, and that Holmes would be chargeable with notice of everything contained in the agreement. Because, in Paragraph 15, the agreement is expressly made binding upon the grantees of the parties to the agreement, Holmes, being chargeable with notice thereof, cannot in good conscience, evade the agreement by becoming a purchaser instead of a tenant. Holmes stands on the same ground as its grantor, Springdale Stores, and if the restriction contained in Paragraph 6 is enforceable against Springdale Stores as to the 7.9–acre parcel, the restriction is also enforceable against Holmes.

The next question is whether the averments of the bill show that the 7.9–acre parcel is subject to the restriction.

By its express terms, Paragraph 6 imposes the restriction against Springdale Plaza, its tenants and subtenants, and Paragraph 15 binds Springdale Plaza's grantees. If Springdale Plaza had directly or indirectly conveyed the 7.9 acres to Holmes to be used by Holmes for a store, we think such use would violate the terms of Paragraph 6 and complainants would be entitled to the injunctive relief prayed for. But complainants do not aver that Springdale Plaza has ever conveyed the 7.9 acres to Holmes, or that Springdale Plaza ever owned or had any interest in the Holmes tract. We find no allegation that Springdale Plaza has breached or threatened to breach its promise set out in Paragraph 6.

Complainants say, however, that Paragraph 6 covers not only the 40–acre Springdale Plaza Shopping Center but also the remainder of the 270–acre tract which was and is owned by Springdale Stores. Complainants say that the agreement must be construed so that Paragraph 6 restricts the entire 270 acres.

We examine the entire 1958 agreement. Only in Paragraph 6 is there any mention of restriction against leasing to Holmes. Complainants aver that Paragraph 6 "purposely" did not limit the area subject to the restriction. In other parts of the agreement, the parties dealt with land outside the 40–acre shopping center and expressly restricted the use of the other land outside the 40 acres. In Paragraph 13, the parties agreed that if Springdale Plaza, or its affiliated corporations, one of which is alleged to be Springdale Stores, then owned or should afterwards acquire title to land

adjacent to the 40 acres, such land should be subject to restrictions against the use of such adjacent land for specified purposes. The parties did not include the restriction against leasing to Holmes among the restrictions so specified. In fact, the parties agreed that the use of the adjacent land "for retail sales or other purposes customary in shopping centers" will not be considered objectionable. The parties must have contemplated leasing or selling the adjacent land to other retail stores but did not prohibit such lease or sale to Holmes or to the other thirteen companies specified in Paragraph 6.

In Paragraph 3(b), the parties specified that additional buildings might be erected on land west of the interstate highway, but imposed no restriction against leasing to Holmes or the other companies.

Complainants aver that: "In agreeing upon said prohibitions the Complainants were well aware that E. E. Delaney and the other Respondents named herein (other than D. H. Holmes Co. Ltd.) owned or controlled the adjacent land * * *." Nevertheless, with full awareness of such ownership, in specifying the landowners who were to be restricted by Paragraph 6, the parties specified only Springdale Plaza and its tenants. The parties to the agreement did not, in Paragraph 6, specify the other respondents, whom the parties did specify in Paragraph 13 and add to the list of persons and corporations subject to restrictions placed on land outside the 40 acres.

In both Paragraph 6 and Paragraph 13, the parties expressed one or more things and omitted others. If the parties had intended Paragraph 6 to apply to other respondents, in addition to Springdale Plaza, it seems reasonable to suppose the parties would have named the other respondents in Paragraph 6 when they were prohibiting leases to competitors. If the parties had intended to apply the restriction to land outside the 40 acres, they would have expressed the prohibition in Paragraph 13

when they were applying prohibitions to land outside the 40 acres, especially so since the parties were well aware of the ownership of the land.

The 1958 agreement is signed by Delaney as President of Springdale Plaza. Complainants were well aware of the ownership of the entire 270 acres, but did not refer to Delaney or Springdale Stores in Paragraph 6.

■ Where a contract is unambiguous and plain in expression, we know of no canon of construction that warrants an interpretation whose only effect is to relieve a party to the contract from consequences deemed by him hard or unfair. Where the parties express without ambiguity their intention, no court can alter the agreement, and no room for judicial construction is left. Lee v. Cochran, 157 Ala. 311, 313, 47 So. 581.

■ When the parties reduce their agreements and obligations to writing, the writing, in the absence of mistake or fraud, is the sole expositor of the transaction and intention of the parties; and a court cannot, under the guise of construction, provide a new and different contract for the parties. Joseph v. Hopkins, 276 Ala. 18, 22, 158 So.2d 660.

■ We do not think that the 1958 agreement is ambiguous. If it were, it would be subject to the rule that restrictions against the free use and enjoyment of property are not favored in the law, and, being in derogation of such right, are to be strictly construed against the enforcement of the restriction. Where the language of the restriction is clear and unambiguous, it will be given its manifest meaning, but its construction will not be extended by implication or include anything not plainly prohibited and all doubts and ambiguities must be resolved against the party seeking enforcement. Bear v. Bernstein, 251 Ala. 230, 231, 36 So.2d 483, 14 A.L.R.2d 1372.

■ We are compelled to conclude that, as the 1958 agreement is now written, the restrictions of Paragraph 6 do not apply to the 7.9–acre Holmes parcel.

We next consider complainants' contention that the averments of the bill show that they are entitled to reformation of the 1958 agreement so as to bring the entire 270 acres under the restrictions of Paragraph 6.

This court, quoting Pomeroy, has said that equity has jurisdiction to reform written instruments in but two well defined cases: (1) Where there is a mutual mistake—that is, where there has been a meeting of minds, an agreement actually entered into but the contract, deed, settlement, or other instrument, in its written form does not express what was really intended by the parties thereto; (2) where there has been a mistake of one party, accompanied by fraud or other inequitable conduct of the remaining parties. Hand v. Cox, 164 Ala. 348, 349, 350, 51 So. 519. See Code 1940: Title 9, § 59; Title 47, § 136. See also: Folmar v. Lehman-Durr Co., 147 Ala. 472, 41 So. 750; Hammer v. Lange, 174 Ala. 337, 56 So. 573; Birmingham Sawmill Co. v. Southern R. Co., 210 Ala. 126, 97 So. 78; Webb v. Sprott, 225 Ala. 600, 144 So. 569; Pearson v. Agricultural Ins. Co., 247 Ala. 485, 25 So.2d 164.

■ Mistake, within the meaning of equity and as the occasion of jurisdiction, is an erroneous mental condition, conception, or conviction induced by ignorance, misapprehension, or misunderstanding of the truth, but without negligence and resulting in some act or omission done or suffered erroneously by one or both of the parties to a transaction, but without its erroneous character being intended or known at the time. It follows that, in order that a court of chancery may know whether the mistake complained of is such as calls for equitable interposition, it is necessary that the bill should state with precision the facts constituting the mistake and going to show whether it occurred without negligence on the part of the party complaining. Pearson v. Dancer, 144 Ala. 427, 429, 39 So. 474.

In Burgin v. Sugg, 204 Ala. 270, 85 So. 533, in a suit for reformation and specific performance of a written contract, the trial court overruled demurrers to the bill and respondents appealed. This court held that the demurrer should have been sustained and reversed the decree. Mutual mistake appears to have been the ground relied on for reformation of the contract. In holding the averments of the bill insufficient to show mutual mistake, this court said:

"Construing the first averment of the bill on the subject most strongly against the pleader, the mistake or inadvertence averred may have been the mistake or inadvertence of one only of the parties to the contract—may have been unilateral. True, a later averment is that 'it was the purpose and intent of the parties,' etc., as shown by the quotation first above, but it still does not appear that the bill complies with that strict rule of pleading which, where reformation is sought, requires a very great degree of particularity of averment in every respect. Dexter v. Ohlander, 95 Ala. 467, 10 South. 527. It is necessary to aver facts showing how the mistake was made, whose mistake it was, and what brought it about, so that the mutuality may appear. 34 Cyc. 974." (204 Ala. at page 272, 85 So. at page 534)

See also American Liberty Ins. Co. of Birmingham v. Leonard, 270 Ala. 17, 115 So.2d 470, where this court held the averments of mistake insufficient to state grounds for granting reformation of an insurance policy.

■ A bill in equity must show with accuracy and clearness all matters essential to complainant's right to relief. These matters must not be made to depend on inference, nor will ambiguous averments be accepted as sufficient. Turner v. Sullivan, 272 Ala. 608, 610, 133 So.2d 254.

■ It requires very great particularity of averment, and very clear proof, to authorize the reformation of a written contract. Ibid.

■ Where fraud is pleaded, either at law or in equity, the facts out of which it is supposed to arise must be stated. A mere general averment of fraud, without such facts, is subject to apt demurrer properly interposed. Ibid. See cases cited in Alabama Digest, Reformation of Instruments, ☞36(1) (3).

■ Equity does not add to the contract terms which the parties did not intend to embody in the writing. Tilley, Alabama Equity Pleading and Practice, page 423; Holland Blow Stave Co. v. Barclay, 193 Ala. 200, 206, 69 So. 118.

■ Appellees state in brief that they have failed to find in the instant bill any averment that Paragraph 6 was the result of any kind of mistake. Neither have we. On the contrary, complainants expressly negate such an averment. They aver that Paragraph 6 "purposely" did not expressly limit the area which Paragraph 6 was to restrict. We must conclude that the bill insufficiently avers that the contract was the result of a mistake.

Neither have we found averment of facts which show that any of the respondents were guilty of fraud or inequitable concealment of facts not known to complainants at the time the contract was made. On the contrary, complainants aver that "In agreeing upon said prohibitions the Complainants were well aware that E. E. Delaney and the other respondents * * * (except Holmes) owned or controlled the adjacent land."

There is no allegation that, prior to the sale to Holmes, the title to the adjacent land had been transferred since execution of the 1958 agreement or that other corporations have since been formed to evade the restrictions of Paragraph 6.

We are of opinion that the averments of the bill fail to show that complainants are entitled to reform the contract.

Of the forty cases relied on by appellants, we think two should be mentioned, first, Parker v. Lewis Grocer Co., 246 Miss. 873, 153 So.2d 261. As we understand the opinion, Parker, the lessor, on March 12, 1956, acquired title to four acres of land, and in that year constructed a building and facilities designed to make the four acres a shopping center. On August 13, 1956, lessor and lessee executed a lease of certain premises in the Maywood Shopping Center. According to the provisions of the lease, lessee agreed to use the demised premises for supermarket purposes only, and Parker, the lessor, agreed not to use himself, or to lease to any other person, any space in Maywood Shopping Center, or any addition or extension thereto, for a supermarket.

On September 11, 1953, lessor, together with M. A. Lewis, Jr., and two others, had acquired title to three and one-half acres immediately west of and adjacent to the original four-acre Maywood Shopping Center. Lewis was a business associate of and attorney for lessor. The two others later conveyed their interest to lessor and Lewis. On August 13, 1956, at the time of executing the lease, lessor advised lessee that lessor intended to expand Maywood Shopping Center on the adjacent land. Early in 1961, lessor began making plans to construct an addition to Maywood Shopping Center on the adjoining land and to lease a part of the proposed buildings to Jitney Jungle for use as a supermarket. Lessor advertised in newspapers his intention to construct an addition to Maywood Shopping Center and requested that lessee waive its rights under the restrictive covenant, but lessee refused. Nevertheless, lessor proceeded with his plans and constructed buildings on the adjoining property. On October 10, 1961, lessor conveyed to Lewis his one-half undivided interest in the western part of the adjoining property and Lewis conveyed the property in question to

lessor's wife. This tract was the south seventy feet. On October 10, 1961, Lewis conveyed to lessor his undivided one-half interest in the remaining part of the adjoining property, making lessor owner of the property except that part which lessor's wife owned of the seventy feet. On December 8, 1961, lessor and his wife leased their land to Brenway Corporation who executed a deed of trust for a bank. Lessee charged that the bank leased the property to Brenway Corporation who intended to lease a part thereof to Jitney Jungle. Lessee charged that all the foregoing constituted a subterfuge to evade the restrictive covenant.

The Mississippi court held that such lease to Jitney Jungle violated the restrictive covenant and that lessee had a right to enjoin lessor from leasing to any other supermarket.

The averments of the bill in the case at bar show no such conveyances or manipulations. In the instant case, no corporation was organized after execution of the 1958 agreement; Springdale Plaza did not own adjacent land at that time nor since, so far as it appears from the bill; there has been no conveyance of adjacent land other than to Holmes; in the 1958 agreement, the land owned by the respective parties to the agreement is shown on the plat attached to the agreement as Exhibit A and is meticulously described by courses and distances in Exhibit B; of the four respondents in the case at bar, only one of them, Springdale Plaza, was a party to the 1958 agreement and no direct or indirect violation of the agreement is charged against Springdale Plaza; and complainants were well aware of the ownership of the adjacent lands but, as stated in appellants' brief:

"* * * It (Gayfer's) only wanted protection against Holmes in areas where it would hurt. So the parties avoided writing a covenant running against specific land and contented themselves with a personal covenant against Holmes and

the other competitors without limit. * * *" (Par. Supplied)

We do not think that the reasons for granting an injunction in the *Parker* case apply here.

The second case is Winslett v. Rice, 272 Ala. 25, 128 So.2d 94. There this court affirmed a decree in a suit for declaratory judgment. The controversy arose out of an alleged oral agreement made between complainants and respondent in connection with a written contract to purchase land. Complainants contended that part of the consideration agreed to be paid was paid as rent for use of certain farm equipment which was on the land at the time the contract was made, but no mention of the oral agreement was made in the written contract. The trial court reformed the written contract by writing therein the oral chattel lease agreement. In affirming the decree, this court said: "In considering the matter of reformation we shall for the moment pass over questions of pleading which have been raised in connection with the right of reformation. * * *" This court also said: "* * * We see no reason why in a bill of this nature, even though the word 'fraud' or the expression 'inequitable conduct' are not used, the court on the allegations of the bill and the proof, may not find the oral contract valid by incorporating it in the written agreement through reformation and grant relief accordingly."

Examination of the original record in Winslett v. Rice does not disclose any averment in the bill of complaint that the contract which the court reformed was made as the result of any sort of mistake or as the result of fraud or inequitable conduct on the part of respondent done or existing at the time of the making of the written contract.

 Under the authorities cited above, Burgin v. Sugg, supra, and others, where a bill of complaint does not contain averment of the facts showing how a mistake was made, or the fraud committed by the offend-

ing party, the bill is subject to appropriate demurrer. Kilgore v. Redmill, 121 Ala. 485, 25 So. 766; Amberson v. Patterson, 227 Ala. 397, 150 So. 353; Shamblee v. Wilson, 233 Ala. 164, 170 So. 769; Atlas Assurance Co., Limited, of London, England v. Byrne, 235 Ala. 281, 178 So. 451; Ballentine v. Bradley, 236 Ala. 326, 182 So. 399; McGregor v. McGregor, 254 Ala. 378, 48 So.2d 312.

In so far as Winslett v. Rice holds contrary to the rule that a bill for reformation is subject to demurrer where the bill fails to aver with sufficient particularity the facts showing the mistake or fraud relied on for relief, Winslett v. Rice is overruled.

The decree appealed from is affirmed.

Affirmed.

All the justices concur.