309 So.2d 435

**Frank T. KENNEDY et al., etc.**

**v.**

**John C. HENLEY, III, et al.**

**SC 593.**

Supreme Court of Alabama.

Jan. 9, 1975.

As Modified on Denial of Rehearing
March 6, 1975.

Balch, Bingham, Baker, Hawthorne, Williams & Ward and Edward S. Allen, Birmingham, for appellants.

Smyer & White, and Harold H. Goings, Birmingham, for appellees.

JONES, Justice.

This is an appeal by the complainants below from an adverse declaratory decree.

Frank T. Kennedy, one of the complainants, contracted with the First National Bank of Birmingham, the other compainant, for the purchase of a lot owned by the Bank, as trustee of the estate of Susie M. Milner, deceased, on the condition that the Bank is able to remove or nullify any restrictive covenant which would prevent Kennedy from building a house thereon. Mr. and Mrs. John C. Henley, III, respondents, own the adjoining property.

In 1915, the properties here in question were part of a tract that was subdivided into 100-foot lots. On April 14, 1915, Milner Land Company conveyed to Lillian M. Orr Lots 24 and 25 subject to restrictions to be in force until January 1, 1930, which read in part:

"3. That no more than one dwelling house and necessary servant houses and outhouses shall be built and exist on each of said lots at any one time."

The east ¾ of Lot 22, Lot 23 and Lot 26 of such survey, being located on either side of Lots 24 and 25, were part of the same subdivision and between 1915 and 1917 came to be owned by George Connors and Forney Johnston, so that in early 1917, the ownerships in the area were as follows:

**1917**

[B1669]

On August 9, 1917, Orr conveyed the west 25 feet of Lot 24 to Connors. The deed contains the following covenant:

"This conveyance is made subject to the conditions and limitations contained in that certain deed executed by the Milner Land Company to the grantor, Lillian M. Orr on the 14th of April, 1915, conveying the above described property,
. . .

"The grantor herein agrees for herself, her heirs, executors and assigns that not more than one dwelling house and outhouses shall be built and exist at any one time on the remaining portion of Lots 24 and 25 . . . and the grantee herein agrees for himself and his executors, heirs and assigns that not more than one dwelling house and outhouses shall be built and exist at any one time on lots owned by him in said survey."

Thus, in August, 1917, the following situation existed:

## August, 1917

[B1667]

Two months later, on October 30, 1917, Orr conveyed to her other neighbor, Johnston, the east 25 feet of Lot 25 with the following provisions:

" . . . the undersigned for themselves, their heirs and assigns, do further covenant to and with the said Forney Johnston, his heirs and assigns, that the undersigned will not build or permit the building of more than one residence or dwelling with the necessary garage and outbuildings on the remaining property in lots 24 and 25 in block 6, according to said survey, now owned by the undersigned or either of them, after conveying the above described strip to Forney Johnston and a similar strip off the westerly side of lot 24 to G. W. Connors, . . ."

In October, 1917, the ownerships were, therefore, as follows:

## October, 1917

[B1668]

A dwelling house was constructed by Johnston, principally on Lot 36 but partially on the east 25 feet of Lot 25. Johnston lived in this residence until 1921, when he and his wife conveyed the property to B. M. Brasfield.

Until June 24, 1922, Orr still owned three-fourths of Lot 25 and three-fourths of Lot 24. As stated, Brasfield had purchased the property adjoining Orr to the east the previous year. Connors still owned the property now held by appellees —Mr. and Mrs. John C. Henley—to the west of Orr.

On June 24, 1922, three things happened. (1) Orr conveyed an additional 25 feet of Lot 25 to Brasfield. (2) Orr conveyed to Murray Brown the west half of Lot 25 and the east three-fourths of Lot 24 (the same property now owned by appellants). (3) Connors and Brown entered into an agreement which provides:

". . . Whereas, the said George W. Connors is the owner of that part of Lot twenty-four in block six . . . which fronts twenty-five feet on Crest Road and twenty feet on the alley in the rear of said lot, and being the same twenty-five feet heretofore conveyed to the said George W. Connors by Lillian M. Orr and her husband, C. P. Orr; And Whereas, the said Murray Brown is about to purchase from the said Lillian M. Orr the remaining portion of said lot twenty-four for the purpose of erecting a residence thereon; now then in consideration of the premises and the further sum of five dollars in hand paid and other valuable considerations, the said George W. Connors for himself, his heirs and assigns hereby covenants with the said Murray Brown, his heirs and assigns that no dwelling house shall ever be erected on that part of said lot twenty-four now owned by the said George W. Connors as aforesaid, nor on any part of said lot twenty-four now owned by the said George W. Connors . . . . ."

Thus, in June of 1922, the ownerships bore the same breakdown as today:

June, 1922, to Present

[B1666]

Brown did not build on his property but held the same until March 9, 1927, when he sold it to Scruggs Investment Company, Inc. On June 28, 1944, Scruggs conveyed it to Susie M. Milner, the predecessor in title to appellants. Two years later Mil-

ner purchased the Brasfield property from the grantee of the Brasfield heirs.

In 1966, Milner's estate sold the Brasfield property to Mr. and Mrs. James Martin who in 1972 conveyed to Mr. and Mrs. Nelson. Also, in 1972, the Bank, as trustee of the Milner estate, contracted to sell to Kennedy for residential purposes the Brown property (the subject 125-foot lot), contingent on a determination that a house could be constructed thereon.

The Henleys gained title to their property from the heirs of Connors in 1966, and the deed is made subject to the August, 1917, Orr-Connors deed and the 1922 Connors-Brown agreement.

■ We observe initially that it is without dispute that because the evidence before the trial Court was by stipulation of the parties, and testimony was not taken orally, the ore tenus rule of review does not apply. Donald v. Donald, 270 Ala. 483, 119 So.2d 909 (1960); Skinner v. Ellis, 245 Ala. 397, 17 So.2d 416 (1944). Our de novo consideration and resolution of the issues here presented are governed by the following legal propositions:

1. Where the language in a deed is plain and certain, acts and declarations of the parties cannot be resorted to to aid a construction. Lietz v. Pfuehler, 283 Ala. 282, 215 So.2d 723 (1968); Hall v. Long, 199 Ala. 97, 74 So. 56 (1917); Dunn & Wife v. The Bank of Mobile, 2 Ala. 152 (1841).

2. Where an ambiguity exists in the provisions of a deed, subsequent acts of the parties showing the construction they put on the instrument, are entitled to great weight in determining what the parties intended. Slaten v. Loyd, 282 Ala. 485, 213 So.2d 219 (1968); Irwin v. Baggett, 231 Ala. 324, 164 So. 745 (1935).

3. Restrictive covenants are to be construed according to the intent of the parties in the light of the terms of the restriction and surrounding circumstances known to the parties. Virgin v. Garrett, 233 Ala. 34, 169 So. 711 (1936); Chattahoochie & Gulf Railway Co. v. Pilcher, 163 Ala. 401, 51 So. 11 (1909).

4. Restrictions against the free use and enjoyment of property are not favored in law and such restrictions are to be strictly construed. Springdale Gayfer's Store Co., Inc. v. D. H. Holmes Co., 281 Ala. 267, 201 So.2d 855 (1967); Bear v. Bernstein, 251 Ala. 230, 36 So.2d 483 (1948); Virgin v. Garrett, supra.

The crucial language of the subject covenant in the Orr-Connors deed is:

"The grantor herein agrees . . . that not more than one dwelling house . . . shall be built and exist at any one time on the remaining portion of Lots 24 and 25."

The question, then, is: Does the use of the words "not more than one dwelling house . . ." include that portion of the Johnston house built on the E ¼ of Lot 25 so as to render the remainder of Lots 24 and 25 (150 feet) useless?

The Henleys contend that the language of this covenant is clear, unambiguous, and bears no interpretation. When Orr later sold Johnston 25 feet off the east side of Lot 25 and Johnston built a portion of his house thereon, say the Henleys, and construction of a residence on the remaining portions of Lots 24 and 25 would constitute "more than one dwelling".

We cannot agree that, within the factual context of this covenant, the language

lends itself to but one interpretation. The original subdivision covenant restricted each dwelling to a minimum of 100-foot frontage. Prior to August, 1917, Orr owned two 100-foot lots on which she was entitled to build two houses. One neighbor to the east (Connors) owned 1 and ¾ lots (175 feet) and one neighbor to the west (Johnston) owned 1 lot (100 feet). It is evident that each neighbor desired 25 feet of additional frontage for the purpose of constructing his residence. At the time Orr conveyed 25 feet to Connors in August, 1917, it is entirely reasonable to assume that Connors wished to make clear that this reduction in the size of Lot 24 would reduce Orr to *one* rather than *two* dwellings on the remaining 175 feet. Also, it is reasonable to assume that Connors was interested in extending the original subdivision restriction beyond the January 1, 1930, deadline.

To assume, as appellees contend, that Orr's subsequent conveyance to Johnston of 25 feet to accommodate a portion of Johnston's dwelling rendered the balance of Orr's property (150 feet) useless is unreasonable, and infers an intention of the parties that is nonsensical. Why would Orr deliberately destroy the utility of the remaining portions of two lots equal in size to 1½ of the original lots in order to sell her neighbors 25 feet each? The absurdity of the supposition upon which this question is based is compounded by the factual certainty that in each instance it was the neighbor who sought the purchase and not Orr who sought the sale. Indeed, Orr made her answer to this question perfectly clear in her deed to Johnston in which she reserved the right to build on the remaining 150 feet. To be sure, Connors was not a party to the Orr-Johnston deed; but Connors executed the Brown agreement, which spelled out Brown's intention to build on the Orr property, subsequent to Johnston's construction on his 25 feet.

Surely, it is beyond the realm of speculation that at the time of the Brown-Connors agreement, Connors knew two crucial facts: (1) He knew the exact location of the Johnston dwelling which occupied a portion of Orr's original Lot 25. This fact is inescapable since for at least four years Johnston and Connors were next door neighbors and the space which separated the west side of Johnston's house from the east side of Connors' house was essentially the area purchased by Brown from Orr as a building site at the same time as the Brown-Connors agreement. (2) He knew further that, in order to build a house on Lot 24 (under the subdivision restrictions), Brown necessarily had to utilize the remainder of Lot 25, which after the sale of an additional 25 feet to Brasfield (who now owned the Johnston property), consisted of 50 feet, or a total of 125 feet for the remaining portions of Lots 24 and 25.

■ It is thus that, from all these circumstances, we are drawn to the conclusion that Connors' execution of the agreement with Brown evinced an intention on his part entirely consistent with that of Orr at the time of the Orr-Connors covenant, i. e., that the subsequent sale by Orr of 25 feet to Johnston and Johnston's construction of a portion of his house thereon did not render the balance of Orr's two lots *useless* under the terms of the Orr-Connors convenant.

"The court must put itself in the position of the parties. It must know what they knew, in order to ascertain, not what they intended to put in writing, but what meaning they attached to the words used." Chattahoochie & Gulf Railway Co. v. Pilcher, supra.

As this Court stated in White v. Harrison, 202 Ala. 623, 81 So. 565 (1919):

"Covenants will, in general, be most strongly construed against the covenan-

**664**

tor; still the paramount rule is to so expound them as to give effect to the actual intent of the parties [citation omitted];"

We believe it is clear that the parties to the covenant in question—Orr and Connors—intended that not more than one house would exist at any one time on a frontage lot of less than 100 feet. The present frontage of Lots 24 and 25, as reconstituted, is 125 feet. The rule of strict construction of restrictive covenants and the rule to give effect to the intention of the parties accommodate, here, to the same result, i. e., that the covenant in question is not enforceable so as to prohibit the use of this property for the erection of a residence thereon.

This Court holds that the reconstituted lots, now consisting of a single building site of 125 foot frontage, are not prohibited from use for residential construction under the terms of the covenant in question.

Reversed and remanded.

HEFLIN, C. J., and HARWOOD, BLOODWORTH, MADDOX and FAULKNER, JJ., concur.

COLEMAN, J., dissents.

MERRILL and McCALL, JJ., concur.

COLEMAN, Justice (dissenting):

Complainants appeal from adverse declaratory decree.

Complainants are a natural person, Frank T. Kennedy, and The First National Bank of Birmingham, a corporation, which sues as trustee under the will of Susie M. Milner, deceased.

The Bank, as trustee aforesaid, owns a parcel of land in Block 6 of Milner Land Company's 2d Addition to Birmingham described as: W ½ of Lot 25 and E ¾ of Lot 24.

Kennedy has entered into a conditional contract with the Bank whereby he agrees to purchase said parcel of land if the Bank is able to remove or nullify any restriction or covenant which would prevent the construction of a residence thereon.

The respondents, John C. Henley, III, and his wife, own an adjoining parcel of land in the same subdivision described as: E ¾ of Lot 22, Lot 23, and W ¼ of Lot 24.

A former owner of all of Lots 24 and 25 conveyed to a predecessor in title of respondents the W ¼ of Lot 24. By the deed conveying said W ¼ of Lot 24 to predecessor of respondents, the grantor, predecessor in title to the Bank, entered into a covenant promising that not more than one dwelling house shall be built and exist at any one time on the remaining portion of Lots 24 and 25.

Subsequently, the Bank's predecessor in title conveyed the E ¼ of Lot 25 to Forney Johnston who then owned Lot 26. Johnston built a dwelling house, partly on Lot 26, and extending twenty-two feet onto Lot 25.

Respondents contend that, because part of a dwelling house has been built on Lot 25, construction of an additional house on W ½ of Lot 25 and E ¾ of Lot 24 would cause more than one dwelling house to exist at one time on the portion of Lots 24 and 25 which remained after conveyance of W ¼ of Lot 24 to respondents' predecessor, and, therefore, would violate the covenant made by the Bank's predecessor who owned all of Lots 24 and 25 at the

time of execution of the deed containing the covenant.

The attached plat of the lots involved may be helpful.

[B1665]

As we understand the record, Lots 22, 23, 24, 25, and 26 all front on Crest Road and the front line of each lot is 100 feet long. For discussion, the lots will be re-

garded as rectangular, and quarters and halves are regarded as they are shown on the sketch.

In 1917, title to Lots 22, 23, 24, 25, and 26 was held by three persons, each of whom owned one of the parcels described as follows, to wit:

1. Connors owned E ¾ of Lot 22 and all of Lot 23.

2. Orr owned Lots 24 and 25.

3. Johnston owned Lot 26.

By Exhibit 2, dated April 14, 1915, Milner Land Company had conveyed Lots 24 and 25 to Lillian M. Orr. Exhibit 2 contains the following description of Lots 24 and 25 and, among others, the restrictions quoted, to wit:

"That part of lots 24 and 25, in blk 6, acdg to the map and surv of the property of Milner Land Co. (Inc) known as the Milner Land Co's 2nd addition to Bham, as. recded in Vol 10 of maps on pg 65, in the off of the Judge of Pro of JCA, S of the driveway, which driveway is indicated on sd map and surv by dotted lines as running across the N part of sd lots, together with the perpetual easement over, and right to use for access to the property hereby conveyed, the sd driveway provided, however, as to sd easement and right, the grantee herein, her heirs and assigns, shall improve, maintain and repair sd driveway, at their own expense, in front of the property hereby conveyed.

"This conveyance is made subj to the fol conditions and

"RP #2

"limitations, which shall exist and continue in force until the 1st day of Jany 1930:

" . . .

"2. That no business house, double house or apartment house of any kind whatsoever shall be built on sd lots.

"3. That not more than 1 dwelling house and necessary servant houses and outhouses shall be built and exist on each of sd lots at any one time.

" . . .

"7. That no stable, garage or other out building shall be placed nearer than 10 ft to either side line of sd lots.

"8. . . .

"It is understood that as a part of the cons of this Deed, the grantee herein agrees to conform to the foregoing conditions and limitations, and that sd conditions and limitations shall attach to and run with the land until the 1st day of Jany 1930 . . . ."

Some of the owners subsequently conveyed to others parts of some of the parcels mentioned. At time of suit, title to three separate parcels rested in three different parties. We next undertake to trace the title and show the respective portions owned by each party at the present time.

### 1.

By Exhibit 3, dated August 9, 1917, for a consideration of $2,250.00, Orr conveyed to Connors the W ¼ of Lot 24. Exhibit 3 recites that the conveyance is made subject to the restrictions contained in Exhibit 2, which is mentioned above. Exhibit 3, the deed from Orr to Connors, contains a covenant by which the grantor, Orr, bound herself and her successors in title with respect to the remaining portions of Lots 24 and 25, to wit: the E ¾ of Lot 24 and all of Lot 25. The covenant recites:

"The grantor herein agrees for herself her heirs executors & assigns that not more than one dwelling house and outhouses shall be built and exist at any one time on the remaining portion of lots 24 & 25 in blk 6 acdg to the map and survey of the property of Milner Land Co. known as Milner Land Co's 2nd Add, to Bham, recd in vol. 10 of maps at pg 65, probate records of JCA and the grantee

herein agrees for himself and his executors, heirs & assigns that not more than 1 dwelling house & outhouses shall be built and exist at any one time on lots owned by him in sd survey."

It will be noted that Connors also bound himself and his successors in title with respect to "lots owned by him in sd survey."

The instant controversy arises out of the covenant undertaken by the grantor, Orr.

Murray Brown subsequently acquired title to a part of Lot 24 and a part of Lot 25 as is hereinafter stated.

Connors entered into an agreement with Brown. The agreement, Exhibit 5B, dated June 24, 1922, is hereinafter discussed.

By Exhibit 8, dated January 10, 1966, the heirs of Connors conveyed to the Henleys, the respondents, the parcel described as follows, to wit:

E ¾ of Lot 22, all of Lot 23, and the W ¼ of Lot 24.

Exhibit 8 recites that the conveyance is subject to the agreement, Exhibit 5B.

As we understand the record, the respondents now own the E ¾ of Lot 22, all of Lot 23, and the W ¼ of Lot 24.

**2.**

As stated above, in 1917, Orr owned all of Lots 24 and 25. As already stated, by Exhibit 3, dated August 9, 1917, which contains the covenant agreeing not to build more than one dwelling house on the E ¾ of Lot 24 and all of Lot 25, Orr conveyed to Connors the W ¼ of Lot 24.

By Exhibit 4, dated October 30, 1917, Orr conveyed to Forney Johnston the E ¼ of Lot 25.

By Exhibit 5, dated June 24, 1922, Orr conveyed to Brasfield the W ½ of the E ½ of Lot 25. Orr thus was left with the W ½ only of Lot 25.

By Exhibit 5A, also dated June 24, 1922, Orr conveyed to Murray Brown the W ½ of Lot 25 and the E ¾ of Lot 24.

By Exhibit 5B, also dated June 24, 1922, Connors executed said agreement to Brown. It recites as follows:

"STATE OF ALABAMA,

"JEFFERSON COUNTY,

Geo. W. Connors
—to—
Murray Brown.

"This agreement made and entered into between George W. Connors, as party of the first part and Murray Brown, as party of the second part, WITNESSETH: Whereas, the said George W. Connors is the owner of that part of Lot Twenty-four in Block Six of Milner Land Company's Second Addition to Birmingham, in Jefferson County, Alabama, a map of which is to be found of record in Volume Ten at page 65, of the record of maps in the office of the Judge of Probate of Jefferson County, Alabama, which fronts twenty-five feet on Crest Road and twenty feet on the alley in the rear of said lot, and being the same twenty-five feet heretofore conveyed to the said George W. Connors by Lilian M. Orr and her husband C. P. Orr; And Whereas, the said Murray Brown is about to purchase from the said Lilian M. Orr the remaining portion to said lot Twenty-four for the purpose of erecting a residence thereon; now then in consideration of the premises and the further sum of five dollars in hand paid and other valuable considerations, the said George W. Connors for himself, his heirs and assigns hereby covenants with the said Murray Brown, his heirs and assigns that no dwelling house shall ever be erected on that part of said lot Twenty-four now owned by the said George W. Connors as aforesaid, nor on any part of said Lot Twenty-four now owned by the said George W. Connors. In witness whereof, I the said George W. Connors, have hereunto set my hand seal on this the 24th day of June 1922."

By Exhibit 6, dated March 9, 1927, Brown conveyed the W ½ of Lot 25 and E ¾ of Lot 24 to Scruggs Investment Co., Inc.; and, by Exhibit 7, dated June 28, 1944, Scruggs conveyed the same land to Susie M. Milner, who owned the same at the time of her death. As hereinafter shown, in 1946, she also acquired the E ½ of Lot 25 and all of Lot 26, which she also owned at her death. The E ½ of Lot 25 and Lot 26 were sold by the Bank as executor of the will of Susie M. Milner, deceased. The Bank, as trustee, now owns E ¾ of Lot 24 and W ½ of Lot 25.

### 3.

Lot 26 was conveyed to Forney Johnston by deed dated March 2, 1917.

By Exhibit 4, dated October 30, 1917, mentioned above, Orr conveyed to Johnston the E ¼ of Lot 25.

By Exhibit 12, dated March 30, 1921, Johnston conveyed to Brasfield the E ¼ of Lot 25 and Lot 26.

By Exhibit 5, dated June 24, 1922, previously mentioned, Orr conveyed to Brasfield the W ½ of E ½ of Lot 25.

Brasfield thus became owner of Lot 26 and E ½ of Lot 25, which were subsequently conveyed to Susie M. Milner by Exhibit 15, dated April 27, 1946, and were owned by her at her death.

We have not found the date of her death. By Exhibit 16, dated May 11, 1966, however, the Bank, as executor of her will, conveyed Lot 26 and the E ½ of Lot 25 to the Martins, who later conveyed to the Nelsons who apparently are the present owners.

The land is now held by three parties as follows:

1. Respondents own E ¾ of Lot 22, Lot 23, and W ¼ of Lot 24.

2. The Bank, as trustee, owns E ¾ of Lot 24 and W ½ of Lot 25.

3. The Nelsons own E ½ of Lot 25 and Lot 26.

### 4.

Forney Johnston built a dwelling house. Part of the house extends 22 feet onto Lot 25. The parties stipulated:

"7. That Joint Exhibit 18, attached hereto and being a plat of the residence located on Lot 26 and a part of Lot 25 is true and correct. The western portion of said house and the carport attached thereto extend from 22.2 to 22.6 feet onto the eastern portion of Lot 25, slightly in excess of 12 feet of such 22.2 to 22.6 feet being occupied by the said carport. Said house was originally constructed by Forney Johnston. The notation of 'brick' at the rear of the residence refers to a brick wall around a portion of the rear yard of the residence, said brick wall being attached to the southwest corner of the carport."

No house stands on the parcel described as E ¾ of Lot 24 and W ½ of Lot 25. In the decree appealed from, the trial court said that in 1944 and 1946, Susie M. Milner acquired the Johnston property and the E ¾ of Lot 24 and W ½ of Lot 25, that she "utilized both these properties as one large dwelling estate and caused to be constructed" on the E ¾ of Lot 24 and W ½ of Lot 25 "a large turn-around or parking area which occupied nearly the entire width of the restricted property." A photograph in evidence (Exhibit 19) supports the statement with respect to the turn-around.

Appellants do not contend that the covenant is not a restrictive covenant running with the land, but contend as follows:

(1) That by the agreement (Exhibit 5B) the parties intended that Mrs. Orr would not build one house on the E ¾ of Lot 24 and a second house on Lot 25;

(2) that the covenant was not violated by her conveyance of E ¼ of Lot 25 to Johnston and his constructing a house extending onto the E ½ of Lot 25;

(3) that the contention of respondents was either not the intention of the parties or was waived or abandoned in 1922; and

(4) that the covenant terminated with the expiration of the restrictions stated in the deed to Mrs. Orr in 1915, Exhibit 2.

Complainants point out that the trial court heard no oral testimony other than agreed statements of counsel and point out that there is no presumption favoring the findings of the trial court, citing Donald v. Donald, 270 Ala. 483, 119 So.2d 909; and Skinner v. Ellis, 245 Ala. 397, 17 So.2d 416.

In Hall v. Long, 199 Ala. 97, 74 So. 56, this court said:

"(3) There can be no doubt of the soundness of the proposition that, where a deed is of doubtful meaning, or the language used is ambiguous, the construction given by the parties themselves, as exhibited by their conduct or admissions, will be deemed the true one, unless the contrary be shown. 13 Cyc. 608. But if the language is plain and certain, acts and declarations of the parties cannot be resorted to to aid a construction. Dunn v. Mobile Bank, 2 Ala. 152. . . ." (199 Ala. at 100, 74 So. at 57)

The language of the restrictive covenant is simply an agreement that "not more than one dwelling house . . . shall be built and exist at any one time on the remaining portion of lots 24 & 25."

There is already a substantial part of a dwelling house on Lot 25. If complainants build another house on the "remaining portion of lots 24 & 25" as stated in the covenant, there will be more than one dwelling on "the remaining portion of lots 24 & 25" in violation of the covenant made by Orr in Exhibit 3, dated August 9, 1917.

As to complainants' contention (1), we agree that the parties intended that Mrs. Orr would not build one house on Lot 24 and another house on Lot 25. The parties also plainly said that not more than one dwelling house shall exist at one time on the remaining portion of said lots which remained after the conveyance of W ¼ of Lot 24 to Connors.

As to contention (2), Johnston's building a part of his house on Lot 25 did not violate the covenant because there was no other house on Lots 24 and 25 at the time he built it, but the building of an additional house on the E ¾ of Lot 24 and the W ½ of Lot 25 will violate the promise that not more than one dwelling house will exist thereon at any one time.

As to contention (4), there appears to be no reason to suppose that the parties intended that Mrs. Orr's covenant should terminate at the same time the restrictions in Exhibit 2, the deed to Mrs. Orr, would terminate. If the parties had so intended, they could have used simple words in the deed to Connors to say that all restrictions in Exhibit 3, the deed from Orr to Connors, shall terminate January 1, 1930, when the restrictions in the deed from Milner Land Co., Inc., would terminate.

Contentions (1), (2), and (4) are clearly without merit.

In contention (3), complainants assert that the restriction set out in the deed from Orr to Connors, Exhibit 3, was waived in 1922. The contention is that when Connors executed the agreement with Brown, Exhibit 5B, Connors waived the covenant in Exhibit 3.

For at least two reasons, the contention of complainants is not sustained. The first reason is that Exhibit 5B does not refer to the covenant made by Orr in Exhibit 3. By Exhibit 5B, Connors agreed to a restriction that no dwelling house shall *ever be erected* on that part of Lot 24 " . . . now owned by the said George W. Connors as aforesaid, nor on any part of said Lot

Twenty-four now owned by the said George W. Connors." If Connors intended also to waive the covenant in Exhibit 3 made by Orr to Connors providing that not more than one dwelling house " . . . shall be built and exist at any one time on the remaining portion of lots 24 & 25," that intent could easily have been expressed in simple language in Exhibit 5B. Such intent is not expressed and to say that it was expressed is to write into Exhibit 5B a provision that the parties did not include therein. The expression of one thing is the exclusion of another.

" . . . The rule is of very general, if not universal application, that where parties have entered into written engagements, with express stipulations, these cannot be extended by implication. The presumption is, that, having expressed some, they have expressed all the conditions by which they intend to be bound." Blackman v. Dowling, 63 Ala. 304, 306; Electric Lighting Co. v. Elder Bros., 115 Ala. 138, 148, 149, 21 So. 983; Jones v. Lanier, 198 Ala. 363, 369, 73 So. 535; Reichert v. Jerome H. Sheip, Inc., 206 Ala. 648, 91 So. 618.

The parties having clearly expressed the intention in Exhibit 5B to place a restriction on the W ¼ of Lot 24 and no other intention, the court cannot extend the contract to imply a release of a different restriction on a different portion of Lots 24 and 25.

The second reason that the 1922 agreement cannot be construed to be a waiver of the restriction contained in Orr's deed to Connors is that there is no evidence to show that Connors had knowledge at the time of the 1922 agreement that Johnston's house was built partly on the remaining portion of Lots 24 and 25.

There is no evidence that Connors knew that Orr had conveyed to Johnston the E ¼ of Lot 25, or that Orr was going to convey to Brasfield the W ½ of the E ½ of Lot 25.

In holding that a building restriction had not been waived by plaintiff in an action for violation of a building restriction by defendant, the Supreme Court of California said:

" . . . Furthermore, the court finds, and the finding is sustained by the evidence, that the plaintiff did not know, until the filing of the answer herein, that the restriction had been violated by any person other than the defendant. *There can be no waiver, in the absence of knowledge of the facts upon which the claim of waiver is based.* (Citations Omitted)" (Emphasis Supplied) Alderson v. Cutting, 163 Cal. 503, 126 P. 157, 158.

See also: Miller v. Klein, 177 Mo.App. 557, 160 S.W. 562; Oakman v. Marino, 241 Mich. 591, 217 N.W. 794; Kumble v. Jaffee, 100 N.J.Eq. 290, 134 A. 673; Polhemus v. DeLisle, 98 N.J.Eq. 256, 130 A. 618; Pellegrino v. MacKenzie St. Const. Corp., 120 Misc. 89, 197 N.Y.S. 699, affirmed, 206 A.D. 709, 200 N.Y.S. 939; Pancho Realty Co., Inc. v. Hoboken Land & Improvement Co., 132 N.J.Eq. 15, 25 A. 2d 862.

The trial court was correct in finding that the restriction has not been waived.

The parties stipulated:

"9. The character of the neighborhood has not materially changed since 1917."

MERRILL and McCALL, JJ., concur.

### ON REHEARING

JONES, Justice.

Application for rehearing overruled and opinion modified.

Reversed and rendered.

HEFLIN, C. J., and BLOODWORTH, MADDOX, FAULKNER, ALMON, SHORES, and EMBRY, JJ., conur.

MERRILL, J., dissents.