ALMON, Justice.
S. Kent Stewart and Julie Stewart, husband and wife, filed an action against Secor Realty & Investment Corporation, alleging breach of contract, negligence, and fraud. The complaint alleged that Secor Realty had breached duties it allegedly owed the Stew-arts to enforce restrictive covenants on a lot adjacent to the Stewarts’ lot in the Lockerbie subdivision in Mountain Brook, Alabama. The circuit court entered a summary judgment for Secor Realty.
In 1987, the Stewarts purchased a lot in the Lockerbie subdivision; they built a residence on that lot. In 1992, the lot to the west of the Stewarts’ lot was bought by the Immels, who built a house on the lot. The Stewarts claim that the Immels’ house impairs the value of their house because it blocks the view of the Stewarts’ house from the street and thereby makes the house less attractive to prospective purchasers. The Stewarts allege that Secor Realty, through its control of the design review committee that approves construction plans in Locker-bie, breached provisions of the declaration of restrictive covenants; that it breached a duty to exercise reasonable care in reviewing and approving the Immels’ construction plans; and that it made fraudulent misrepresentations to the Stewarts regarding the benefit of the design review committee’s approval process, thereby inducing the Stewarts to purchase their lot and to build their house as they did.
The Lockerbie subdivision was developed by a predecessor of Secor Realty, but we shall refer simply to Secor Realty as the developer. Secor Realty recorded a set of covenants and restrictions applicable to the entire Lockerbie development. The declaration of covenants and restrictions states that it is “declared and agreed to be in furtherance of a general plan for the subdivision and development of the Properties and is established for the purpose of enhancing and protecting the value, desirability and attractiveness thereof.” The covenants required that all construction and improvement plans be approved by a design review committee. Article IV, Section 1, Covenant E, “Improvements and Alterations,” provides, in pertinent part:
“The Design Review Committee shall have the right to refuse to approve any plans or specifications or landscape plans, which are not reasonably suitable or desirable, in its opinion, for aesthetic or other reasons, and in so passing upon such plans, specifications and landscape plans, and without any limitation of the foregoing it shall have the right to take into consideration the suitability of the proposed building or other structure, and of the materials of which it is to be built, the site upon which it is proposed to erect the same, the harmony thereof with the surroundings and the effect of the building or other structure as planned, on the outlook from the adjacent or neighboring property.... All decisions of the Design Review Committee shall be final unless overridden by a vote of 3/4 of the members of the Board [of Directors of the Lockerbie Association, Inc.], and no Owner or other parties shall have recourse against the Design Review Committee or the Board for its refusal to approve any such plans and specifications or plot plan.”
Article VII, Section 6, also expressly states that “neither the Design Review Committee nor any member thereof shall be liable to the Association, any Owner, or to any other party” for its approval or disapproval of any plans.
Mr. Stewart testified by deposition that when he was considering purchasing a lot in Lockerbie he spoke with Hayden Wood, an officer of Secor with responsibility for developing Lockerbie and selling lots. He testified that he relied upon representations made by Mr. Wood and made in a promotional brochure, that the Lockerbie development was planned as an exclusive residential community. The promotional brochure referred to the Lockerbie development as a “Lifelong Dream” and claimed that the houses in that development would be “positioned to compliment [sic] and capitalize on their surroundings.” The promotional literature also claimed that “As a group, the homes’ exteriors will be visually compatible.”
*54 Mr. Stewart testified:
“Hayden stressed the fact that the covenants and restrictions in Lockerbie were very strict, and that their primary concern was to make sure that the property values appreciated....
[[Image here]]
“Well, Hayden not only represented that they would do whatever [was] necessary to preserve property values, he also recommended where I place the house on the lot.
[[Image here]]
“... He was familiar with the restrictions and the setback lines. And at his suggestion, we situated our homes as far to the line as possible so that we would have a lot of space between the homes.[1]
“And his representation to us was, if you’re the first to build, whoever comes in next will have to move ten feet off their property line.
[[Image here]]
“Q. And there is at least ten feet between your property and the Immels’ property, is there not?
“A. There is now, yeah.
“Q. What do you mean there is now?
“A. Well, the original stakes, I believe, were inside ten feet. And I believe they moved them. But there is ten feet, yes, between our structure and their structure.”
In addition to placing their house as close to the vacant lot as the setback lines would allow, the Stewarts also placed their house toward the rear of their lot and angled it so the front windows partially faced the vacant lot.
After the Stewarts’ house was completed, the adjoining lot was sold to the Immels. The Immels submitted their plans to the design review committee. Before the construction of the Immels’ house, their plans were also submitted to the landscape committee. Mrs. Stewart was on the landscape committee and saw at least some of the plans when they were submitted. One of the other landscape committee members suggested that Mrs. Stewart “step off’ the boundaries of the Immels’ house to see where the house would be located on the lot, but she declined.
After the design review committee approved the Immels’ plans, the Immels began construction. The Immels’ house is within all of the setback lines required by the covenants and restrictions. It is positioned fairly close to the front of their lot, but several feet behind the front setback line.
After construction of the Immel house was under way, the Stewarts became concerned with the position of the Immels’ house on the lot. However, the construction of the Immel house was completed essentially as planned. The Stewarts complain that the Immels’ house blocks the view from the front windows in their living room and causes their house to be less appealing from the street. The Stewarts also claim that the Immels’ house is too large for the lot upon which it sits. According to the Stewarts, the position of the Immels’ house reduces the value of their house in an amount between $20,000 and $100,000.
However, and most importantly, the Stew-arts do not dispute the fact that the Immels’ house is within all of the setback lines pertinent to their lot. Moreover, the western side of the Immels’ lot is encumbered by a sewer easement that precludes construction on that portion of their lot and which was recorded before the Stewarts purchased their lot. The Immels’ house is built as close to the sewer easement as possible. It essentially fills the lot, which is smaller than the Stewarts’ lot. Thus, the Stewarts’ complaint about the approval of the Immels’ construction plans resolves to a complaint that the Immels’ house is too large for the lot. The restrictive covenants require that houses have a minimum of 2500 square feet, but they do not set a maximum size.
This Court has addressed the issue whether a property owner is entitled to a view. In Gulf House Association, Inc. v. Town of Gulf Shores, 484 So.2d 1061 (Ala. *55 1986), a group of condominium owners sought to enjoin the owner of adjacent land from building condominiums because the proposed construction would destroy the view from the plaintiffs’ land. This Court held:
“The residents of Gulf House have no legal entitlement to a view across the Waters property. In Ray v. Lynes, 10 Ala. 63 (1846), the court said:
“ ‘[O]ne who erects a house in a city or town, on the margin of his lot, with a window opening upon the lot of an adjoining proprietor, does not thereby acquire such a right to the use of his window, as to deprive the adjoining proprietor of the right to build on his lot, in any manner his judgment, or fancy may dictate.... [I]t was the folly of the plaintiff to construct his house as to be dependent on the adjoining proprietor, for light and air.’ ” ”
484 So.2d at 1063-64.
The Stewarts argue that Gulf House is distinguishable from the present case because Gulf House involved only the right to a view, whereas the Stewarts are seeking an award of damages for a diminution in value that they allege resulted from the design review committee’s failure to enforce the covenants and restrictions regarding the aesthetic compliance and harmonious blending of houses built on adjoining lots in this high-value development. This, under the circumstances alleged and the evidence presented, is a distinction without a difference. The Stewarts complain that the placement of the Immels’ house diminishes the “curb appeal” of their house, because the view of the Stew-arts’ house is partially blocked by the Im-mels’ house as one approaches from the west. This amounts to an assertion that the Stew-arts are entitled to a view of their property from the street by prospective purchasers; this is even less a property right than that asserted in Gulf House.
Even within the terms of the broad statements in the restrictive covenants—to the effect that the covenants are “for the purpose of enhancing and protecting the value, desirability and attractiveness” of the properties and that the committee is to consider aesthetics, the suitability of the proposed construction, and “the harmony thereof with the surroundings and the effect of the building or other structure as planned, on the outlook from the adjacent or neighboring property”—the Stewarts have not presented substantial evidence of breach of contract or negligence.
The Stewarts’ argument for Secor’s responsibility for the actions of the design review committee is not clear. At some points the argument seems to be that Secor was responsible for ensuring that the committee members had proper expertise to perform the committee’s functions. They argue that, because the members of the design review committee were not architects or developers, the committee was .incapable of enforcing the covenants and restrictions properly. However, the covenants and restrictions upon which the Stewarts claim to have relied expressly state that no member of the committee need be an architect or developer.
At other points the Stewarts seem to argue that Secor Realty is to be held liable for the actions of the design review committee simply on a theory that the acts of the committee are the acts of Secor Realty. Perhaps their assertion of liability is based on Secor Realty’s ability to select the members or on the fact that two Secor Realty officers are on the three-member committee and another Secor Realty officer is one of the two alternates. However, no arguments are developed on this point, either by the Stewarts or by Secor Realty. Moreover, the parties do not argue the effect of the provisions in the restrictive covenants that the design review committee is not to be held liable for approval or disapproval of any plans. It appears that the circuit court may have correctly entered the summary judgment either because Secor Realty is not responsible for the actions of the design review committe or because, if it is responsible, it is shielded by the covenant provision disavowing any liability to property owners for actions of the committee.
In any event, the summary judgment is due to be affirmed on the merits. In Bramlett v. Dauphin Island Property Owners Association, 565 So.2d 216 (Ala.1990), *56 this Court recognized that a design review committee had the authority to require a lot owner to build only in accordance with the applicable covenants and restrictions. In Bramlett, the issue was whether the property owners’ association was entitled to have Bramlett remove a structure that he had erected in violation of a provision requiring a 25-foot set-back line. Bramlett obtained approval of his construction plans, but then modified them in a way that violated the setback requirement, without seeking approval of the modification. Because the Immels’ house is within all of the objectively enforceable covenants, Bramlett does not support a holding that the design review committee breached the covenants or was negligent in approving the Immels’ plans. While the committee might have been within its authority to require modifications of the Immels’ plans, the speculative and imprecise possibility that any such action could have been taken precludes a finding that the Stewarts can hold Secor Realty liable for breach of the covenants or for negligence for the committee’s failure to take such action.
At most, the complaint alleges that the committee failed to exercise its discretionary, subjective judgment to require the Immels to reduce the size of their house or to substantially change their plans to accommodate conditions created by the Stewarts with an admitted intent to restrict the construction choices of the purchaser of the lot to their west.- The evidence that Hayden Wood suggested this placement of the Stewarts’ house so as to limit the later construction next door is problematic, but it does not support a claim against Secor. The Stewarts cite this evidence in support of their fraud allegations, but the evidence would not support a finding of a material misrepresentation. The fraud allegations generally pertain to alleged promises by Secor to perform in the future — to enforce the covenants so as to maintain property values, etc. There is no evidence of an intent in 1987, when the representations were made, not to perform them. Without such proof of an intent not to perform, no recovery may be had for promissory fraud. P & S Business, Inc. v. South Central Bell Tel. Co., 466 So.2d 928 (Ala.1985).
Even if Mr. Stewart’s evidence is construed as evidence of a present misrepresentation by Mr. Wood in 1987, i.e., as a representation that construction near the Stewarts’ lot line would require the next purchaser to build at least 10 feet away, there is no misrepresentation shown, because the representation was true. The Im-mels, in fact, initially placed the stakes outlining their foundation too close to the Stewarts’ house, and the design review committee required them to reposition the stakes so as to comply with this requirement.
For the foregoing reasons, the judgment of the circuit court is due to be affirmed.
AFFIRMED.
HORNSBY, C.J., and HOUSTON, INGRAM, and BUTTS, JJ., concur.

1.. Stewart and a friend of his bought adjoining lots and built houses about the same time; the friend's house is east of the Stewarts’ house. They apparently separated their houses by as much distance as the lot lines would allow, so that the Stewarts' house is close to the western lot line.