Rel: August 29, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2025

_____

### SC-2024-0414

_____

### Rodney G. Englund, Dyann K. Englund, and Georgetown Contractors, LLC

### v.

### Dauphin Island Property Owners Association

_____

### SC-2024-0437

_____

### Dauphin Island Property Owners Association

### v.

**Rodney G. Englund, Dyann K. Englund, and Georgetown Contractors, LLC**

**Appeals from Mobile Circuit Court**
**(CV-22-901826)**

BRYAN, Justice.

In case no. SC-2024-0414, Rodney G. Englund, Dyann K. Englund, and Georgetown Contractors, LLC ("Georgetown"), appeal from a judgment of the Mobile Circuit Court ("the trial court") granting permanent injunctive relief to the Dauphin Island Property Owners Association ("the DIPOA"). The injunction required the Englunds and Georgetown to stop construction of the Englunds' house on Dauphin Island and to remove those portions of the house that the trial court found had been built in violation of certain restrictive covenants. Alternatively, the Englunds also appeal from the denial of their counterclaim asking the trial court to require the DIPOA to enforce restrictive covenants against their neighbor. In case no. SC-2024-0437, the DIPOA has cross-appealed from the trial court's denial of its request for an award of attorney fees.

For the reasons explained below, in case no. SC-2024-0414, we reverse the trial court's judgment and render a judgment in favor of the

Englunds and Georgetown. As a result of that disposition, we dismiss as moot the DIPOA's cross-appeal in case no. SC-2024-0437.

Background

The Englunds own Lot 23 in the Silver Cay II subdivision on Dauphin Island. The lot borders Island Shores Drive and extends north to the Mississippi Sound. The Englunds own and operate Georgetown, a contracting company. They obtained a building permit from the Town of Dauphin Island ("the Town") in August 2022. Georgetown then began construction of a house on Lot 23.

In early October 2022, the DIPOA issued a stop-work order to the Englunds and Georgetown. It said that the construction on Lot 23 violated certain restrictive covenants that required approval by the DIPOA before any work began. Although the Englunds and Georgetown had obtained a permit from the Town, they had not obtained a separate permit from the DIPOA.

I. Procedural History

The DIPOA filed its complaint for declaratory and injunctive relief on October 17, 2022. The complaint alleged that the Englunds and Georgetown ("the defendants") had violated the pertinent restrictive

covenants by failing to get approval from the DIPOA for construction on Lot 23 and that they had continued work on the house despite the stop-work order. It also alleged that the Englunds' house violated a restrictive covenant applicable to Lot 23 that prohibited buildings from extending more than 90 feet from the road. The Englunds' house, the complaint alleged, violated that restriction by approximately 23 feet.

The DIPOA sought a judgment declaring that the defendants had violated the covenants. It sought a permanent injunction requiring the DIPOA's approval before any further construction on the Englunds' house and removal of any part of the house that extended beyond the 90-foot setback. The DIPOA also sought an award of attorney fees that it said were provided for in the restrictive covenants.

The trial court granted a temporary restraining order requiring the defendants to cease work on the house pending resolution of the proceedings. The defendants answered the complaint. They asserted various affirmative defenses, including that the 90-foot setback requirement was inequitable, that a permanent injunction would cause severe hardship to the Englunds, and that the character of the neighborhood had changed such that the setback requirement no longer

4

served a valid purpose or provided any benefit to the neighborhood and should not be enforced.

In May 2023, the defendants amended their answer, and the Englunds asserted a counterclaim against the DIPOA. The counterclaim alleged that structures on Lot 24, which is adjacent to the Englunds' property, violated both the 90-foot setback requirement and covenants restricting the location of piers. The counterclaim asked that, if the covenants were found enforceable as to the DIPOA's claims against the defendants, the DIPOA be made to require the owners of Lot 24, Randolph Coale and Natalie Coale, to remove their pier and portions of their deck and pool that also allegedly violated the covenants. The pleading did not name the Coales as parties or state any third-party claim against them.

The DIPOA moved to dismiss the counterclaim, but that motion was not ruled on before trial. The claims were ultimately tried in a bench trial on December 11, 2023, and December 12, 2023. The trial court received documentary evidence and heard testimony from several witnesses. On February 14, 2024, the trial court issued its judgment.

In relevant part, it stated the following:

5

"The Court finds the Englunds have violated restrictive covenants by failing to obtain a building permit from the [DIPOA] and by violating the applicable Silver Cay II setback requirement. The [DIPOA] is entitled to enforce the covenants through permanent injunctive relief.

"The Court further Orders the Englunds to remove all portions of the building under construction that violates the 90[-]foot setback line forthwith.

"Any and all further or additional work to alter and/or complete the project on Lot 23 Silver Cay II Subdivision shall comply with all applicable covenants, only after acquiring the appropriate building permit(s) from the [DIPOA].

"The Counterclaim filed by the Englunds is DENIED.

"All costs, fees, and attorney fees are the responsibility of the respective parties."

(Capitalization in original.) Although the trial court's judgment noted that the defendants had asserted affirmative defenses, it did not otherwise expressly address them.

The defendants moved to alter, amend, or vacate, the judgment on February 16, 2024. See Rule 59(e), Ala. R. Civ. P. They argued that the trial court had failed to consider their equitable arguments that enforcement of the 90-foot setback requirement against them would cause undue hardship and that the covenant was unenforceable because of a change in the neighborhood. They also argued that the trial court

6

had failed to properly consider the Englunds' counterclaim. The trial court did not rule on the postjudgment motion, and it was denied by operation of law on May 16, 2024. See Rule 59.1, Ala. R. Civ. P.

While the postjudgment motion was pending, the DIPOA moved twice for an award of costs and attorney fees. The trial court denied its requests. The defendants appealed (case no. SC-2024-0414). The DIPOA cross-appealed (case no. SC-2024-0437).

II. Factual Background

The evidence presented by the parties during trial shows the following relevant facts. Due to the unique history of Dauphin Island, to build on most properties, property owners must obtain permits both from the Town and from the DIPOA. The Town permitting process requires plans to comply with the Town's building ordinances. Separately, the DIPOA permitting process requires plans to comply with any restrictive covenants that may apply to a particular property. The DIPOA has authority to enforce restrictive covenants applicable to most properties on Dauphin Island. Certain covenants apply generally to the whole island, while others apply only to specific neighborhoods or particular

7

lots. Restrictive covenants may be put in place by private developers, but often enforcement authority is granted to the DIPOA.

Most work of the DIPOA is done by volunteers. The DIPOA has an architectural committee, which reviews permit applications submitted to the DIPOA. The committee makes recommendations to the DIPOA board, which then votes to approve or deny the applications. In addition to permitting, the DIPOA owns and manages a golf course, a clubhouse, a pool, several parks, and approximately five miles of beachfront. The DIPOA does not regularly monitor new construction for violations of restrictive covenants. Its board or architectural-committee members typically investigate potential violations only after receiving complaints from neighboring property owners.

The Town and the DIPOA operate out of separate offices and have separate permit-application forms. The Town's application includes a section with multiple check boxes, which the Town uses to notify applicants if they need additional permits or coordination with other authorities. This section of the application includes a check box for the DIPOA. The Town's permit office makes DIPOA application forms available for applicants. It also displays a sign stating that applicants

8

may need to contact the DIPOA for additional permits.  The sign is printed on standard paper and is displayed alongside other notices.

The DIPOA's application instructs applicants not to begin work until the DIPOA has issued its approval.  It states:

> "DO NOT COMMENCE WORK UNTIL WRITTEN APPROVAL IS RECEIVED FROM DIPOA.  A BUILDING PERMIT ISSUED BY THE TOWN OF DAUPHIN ISLAND DOES NOT SUPPLY, SATISFY OR WAIVE FOREGOING REQUIREMENT.
>
> "FURTHER, NO EMPLOYEE OF THE TOWN IS AUTHORIZED TO GRANT APPROVAL OR WAIVE ANY REQUIREMENTS OF DIPOA.
>
> "THE PERMITTING PROCESS IS NOT COMPLETE UNTIL THE APPLICATION IS APPROVED BY THE DIPOA OR THE PERMIT FEE IS PAID.  DO NOT BEGIN WORK UNTIL YOU RECEIVE WRITTEN NOTICE OF APPROVAL."

(Emphasis and capitalization in original.)

The Town and the DIPOA have made efforts to simplify the permitting processes for Dauphin Island property owners.  By a 1990 agreement, the Town was to review permit applications for compliance with restrictive covenants in exchange for a fee paid by the DIPOA.  That agreement was modified in 1997.  Under the 1997 agreement, the Town was to require applicants to provide additional plot plans and building

9

plans for the DIPOA. The Town was also to ask applicants to complete the DIPOA application form. The DIPOA was to collect plans and application forms from the Town each week. The DIPOA architectural committee, rather than the Town, was to review the plans for compliance with restrictive covenants and notify applicants of the results of its review within 14 days.

The 1997 agreement was titled "One Building Permit Application System Agreement" and is referred to by the parties as the "one-stop agreement." That agreement includes a provision stating that it "may be terminated by either party with 30 days['] written notice." It is undisputed that neither the Town nor the DIPOA ever provided such notice of termination.

It is also undisputed that the Town and the DIPOA did not always cooperate successfully according to the terms of the agreement. The head of the Town's permit department, Terry Sheffield, testified that the one-stop agreement had never been fully explained to him. He understood that there was just "a gentlemen's agreement" between the Town and the DIPOA, whereby the Town would make information available to the DIPOA, but that it was not required to do so. Sheffield faulted the

DIPOA for any failures of cooperation. He stated his belief that, at times, infighting among members of the DIPOA board would result in delays. At times, the DIPOA would pick up applications weekly as required by the one-stop agreement. At times, it would not. At times, the DIPOA would take longer than 14 days to reach a decision, at cost to property owners.

DIPOA witnesses, however, faulted the Town for any failures of the one-stop agreement. They said that the forms received by the DIPOA were often illegible, such that the DIPOA could not identify the applicant or the property at issue. They also said that, at times, the Town would not provide all necessary documents or information.

A DIPOA board member said that, approximately five years before trial, the Town notified the DIPOA that it would continue to collect plans and documents for the DIPOA but that it would no longer withhold issuance of its own permit pending approval by the DIPOA. Thus, as long as applicants complied with the Town's ordinances, the Town would issue its permit regardless of whether the DIPOA had approved the application or whether its review was complete.

The DIPOA argues that the one-stop agreement was thus terminated by the Town. However, the 1997 agreement did not require the Town to withhold its permits pending DIPOA approval. No written notice terminating the agreement was ever made by either party, as required by the agreement. And, when the Englunds applied for their permit and at the time of trial, the Town still collected information from applicants and provided it to the DIPOA according to the terms of the agreement. Approximately six months before trial, the Town began providing the DIPOA information by email. One DIPOA board member testified that cooperation between the Town and the DIPOA works much better under that procedure.

The Englunds, operating through Georgetown, had built other houses on Dauphin Island. For those houses, Rodney Englund had completed the DIPOA's application forms and received DIPOA permits. The evidence did not show whether Rodney submitted those forms via the Town's permit office under the one-stop agreement or directly to the DIPOA. For the house on Lot 23, however, he did not complete the DIPOA's application form or receive a permit from the DIPOA.

12

Rodney testified that an employee at the Town permit office told him that he did not have to go directly to the DIPOA but that, rather, the Town would deliver his plans for him. He testified:

"I gave her my check. She gave me the permit. And while I was there, I asked her, I said: I haven't been to the [DIPOA], is it absolutely necessary I go? She said, no. We contact the [DIPOA] for you and they'll be in touch with you, so you don't have to go there. So I didn't."

Sheffield testified that it was the Town's policy at the time to collect two sets of plans from applicants, one for the Town and one for the DIPOA. He stated that it was the Town's policy at the time for permit clerks to notify the DIPOA that permit applications had been made. According to Sheffield, most contractors who work on Dauphin Island know to go directly to the DIPOA for a separate permit and that it is not merely the Town's responsibility to notify the DIPOA. It was possible, he said, that a permit clerk had told Rodney that the Town would send a copy of the Englunds' permit application to the DIPOA. But he said that the permit clerks typically notified applicants, by checking the DIPOA box on the Town's form, that they needed to go to the DIPOA for approval.

13

The DIPOA check box on the form given to Rodney was not marked.[1] Sheffield did not know why the check box was unmarked and assumed that it was an oversight. He testified that July and August that year were "chaotic" times for the Town's permit office. It experienced staff changes and transitioned to a new computer system. Sheffield did not know if the Town sent a copy of the Englunds' application to the DIPOA. DIPOA witnesses testified that they never received the application.

The Englunds' deed to Lot 23 states that the "conveyance is made subject to restrictive covenants, easements, rights-of-way and building setback lines, if any, applicable to said real property, of record, in the Office of the Judge of Probate Court of Mobile County, Alabama." It is undisputed that the Englunds did not try to find out what restrictive covenants applied to their property before they began construction.

---

[1]A later copy of the form from the Town's files does have the DIPOA check box, and other boxes, filled in. Sheffield testified that a FEMA inspection had found discrepancies with 25 files for which paperwork was not completed properly. The Town's employees, Sheffield said, went back and changed those records to mark them properly to bring them into compliance with FEMA regulations. He assumed that is what had happened with Rodney's form. However, it seems undisputed that, on the original form, the DIPOA check box was not filled in.

Restrictive covenants generally applicable to much of the property on Dauphin Island were recorded in the 1950s and are referred to generally as the "green sheets." The DIPOA presented a document that its board member and former president, Dennis Knizley, identified as the green sheets. It is titled "CONDITIONS, RESERVATIONS, RESTRICTIONS, LIMITATIONS, EXCEPTIONS, AND EASEMENTS applicable to the 1953 Subdivision of Dauphin Island Alabama." Paragraph 1(a) of the document provides that no building shall be constructed without approval and permitting by the architectural committee of the DIPOA. In case of violations, paragraph 12 of the document gives the DIPOA authority to enforce its restrictive covenants by "appropriate proceedings in a court of competent jurisdiction" and provides that the DIPOA "shall be able to recover damages, other compensation, and/or attorney's fees and costs for such violations." Paragraph 12 also states: "The failure to enforce any of the restrictions herein set forth at the time of their violation shall in no event be deemed to be a waiver of the right to do so thereafter."

Knizley testified that the document was the original green sheets by which the DIPOA operated. However, the document includes the

heading "As Amended," bears no date, no signatures, and no marks showing that it had been recorded. Counsel for the parties discussed on the record questions raised by the "As Amended" heading. Counsel for the DIPOA noted that "there have been several retypes of the green sheet" but that he had submitted the "original" to the trial court. Counsel for the defendants expressed doubt that the document was the original but never objected to its admission or to the DIPOA witnesses' reliance on it.[2]

Lot 23 is part of a subdivision known as Silver Cay II. Restrictive covenants applicable to the subdivision were recorded in 1984 and were submitted to the trial court. They adopt by reference paragraph 1 and paragraph 12 of the "'Building Restrictions and Protective Covenants applicable to the 1953 Subdivision of Dauphin Island, Ala[bama],' dated the 15th day of June, 1954[,] and recorded in Deed Book 601 N.S. Page 402 in the office of the Judge of Probate of Mobile County, Alabama." The Silver Cay II restrictive covenants provide:

---

[2]The defendants did argue in their posttrial and postjudgment briefs that the document was not authenticated. On appeal, the DIPOA has moved to strike that argument.

16

"No building shall be located on any lot nearer than 30 feet to any street ….   No building shall be located on any lot numbered 19 through 27 inclusive, further than 70 feet to the back of the building from the front lot line. … For the purpose of this covenant, eaves and steps shall not be considered as part of the building …."

The 70-foot setback was extended to 90 feet for lots 19 through 25 by an amendment recorded in 1993 and confirmed by another amendment recorded in 1996.

It appears from the Silver Cay II plot plan that lots 19 to 27 are a row of lots in the subdivision that border the Mississippi Sound.  The rest of the neighborhood comprises interior lots with no water access or lots with water access that sit significantly to the north due to a curve in the shoreline.

The original purpose of the setback requirement applicable to Lot 23 is unclear.  Witnesses who testified for the DIPOA had no memory of the original purpose but believed that it was to preserve sunset views for neighboring houses.  Thus, the DIPOA argues, the restriction is still necessary.  The defendants posit that the purpose of the restriction was to keep houses a safe distance from the water.  They submitted evidence indicating that the shoreline has changed due to the accretion of sand after major storms and that the water line is now significantly further

from the street than it was when the restrictions were originally recorded. Thus, they argue, the setback requirement now serves no legitimate purpose.

The Town issued its building permit to Georgetown for Lot 23 on August 18, 2022. Rodney testified that, before he had house plans created, he met with Sheffield and another inspector at Lot 23 to help him determine how big a house he could build. According to Rodney, with their help, he staked out corners for the house. For the side facing the street, he lined up the front of the house with other houses and measured the appropriate setback according to the town's regulations. For the side facing the shore, Rodney said that he was told that he could build anywhere he wanted, so long as it was a certain distance from the high-tide mark.

Sheffield remembered meeting with Rodney. He remembered measuring the setback from the street and generally walking off the shore side of the house. He did not remember telling Rodney that he could build as far back as he wanted. Sheffield testified that he generally tells landowners to make sure that they line up with other houses on each

side.  Neither Rodney nor Sheffield remembered discussing anything about the 90-foot setback.

The defendants thereafter created plans for the house, ordered materials, and began construction.  When asked why he did not follow up to make sure that he had the DIPOA's approval before beginning construction, Rodney testified that he was busy and forgot.  He stated that, at the time, his wife Dyann had been sick with COVID and that he was working on three other houses.

Work on the Englunds' house proceeded.  When asked at trial whether he had seen the construction when it began, Knizley testified: "I'm sure I did.  I didn't pay particular attention to it[,] but I'm sure I saw the construction."  DIPOA board member and current president Eric Bay testified that he had taken a photograph of the construction when rafters had been erected but the roof and walls had not yet been put in place.  When asked about his failure to further investigate the construction, he stated: "[Y]es, I could have gone way out of my way to do something [the defendants] could've done.  … Why is the onus on us when [Rodney] knew who we were and didn't apply to us[?]"

19

Once the pilings were driven, the house was framed, and the roof was on, the Englunds' house extended closer to the shore than the neighboring houses. It violates the 90-foot setback requirement by approximately 23 feet. The defendants note that neighboring decks and pools extend as far back as the Englunds' house. However, it is parts of the main body of the Englunds' house, not a deck or a pool, that sit beyond the 90-foot setback.

As construction began, a neighbor told the Englunds that the house was too far back and violated the 90-foot setback requirement. Rodney stated that he did not know anything about a setback requirement and assumed that his construction was fine because that neighbor's deck and pool were the same distance from the street. The DIPOA received complaints from the Englunds' neighbors about the house and investigated. It issued its stop-work order on October 5, 2022.

A cover letter written by the DIPOA attorney mentions the Englunds' failure to obtain a DIPOA permit and an apparent violation of the neighborhood setback requirement. The stop-work order itself mentions only the Englunds' failure to obtain the DIPOA's approval. It also mentions the DIPOA's intent to file suit and seek costs and attorney

fees if the Englunds did not comply with that requirement. The DIPOA attorney did include recorded copies of the Silver Cay II restrictive covenants and an unrecorded copy of the green sheets.

Rodney testified that, the same day he received the stop-work order, windows and doors were delivered to the house. The delivery was early and unexpected. Rodney stated that he could not return the materials. So, to prevent the loss of $20,000 to $25,000 worth of materials, he had them installed despite the stop-work order. The DIPOA filed its complaint shortly thereafter, on October 17.

Upon receiving the stop-work order, Rodney was upset and went directly to the DIPOA office. He made his displeasure clear to the DIPOA members there. Later, more calmly, he asked what he could do to remedy the violations. He was told that he could apply for a variance if his immediate neighbors agreed.

While litigation was pending, the Englunds did obtain consents from their immediate neighbors and applied to the DIPOA for a variance. Both consents were the result of negotiations. For a neighbor on one side, Phillip Hayes, the Englunds agreed to build him an extended porch to preserve his property's sunset views. For the neighbors on the other side,

the Coales, the Englunds agreed not to file suit directly to have them remove their pier, which allegedly encroached on the Englunds' water line and interfered with the placement of their own pier.

Under the Englunds' reading of the 90-foot setback requirement, per the plain language of the restriction, any structure besides eaves and steps could not extend beyond 90 feet from the street. Thus, under that reading, the Coales' deck and pool were in violation of the setback requirement. Also, although the Coales had obtained the DIPOA's approval for the placement of their pier, the Englunds alleged that it too was in violation of a restrictive covenant and actually encroached into the Englunds' water line. The Englunds argued that the encroachment interfered with their ability to build their own pier in compliance with the restrictive covenants.

At the time the Englunds and the Coales entered into their agreement about the variance, the Englunds had already filed their counterclaim seeking an injunction requiring the DIPOA to enforce the covenants against the Coales. In exchange for the Coales' consent to the variance, the Englunds agreed not to sue the Coales directly but would continue to pursue their counterclaim against the DIPOA.

The consents from both neighbors were limited to the Englunds' obtaining the variance from the DIPOA. The consents also were given solely for the pending application and would not extend to any future requests for a variance by the Englunds.

The DIPOA architectural committee recommended approval of the variance, but the DIPOA board denied it unanimously. Bay testified that the board denied the variance for three primary reasons. First, the DIPOA board did not want to set a bad precedent for future applications, such that landowners would build wherever they wanted and destroy the views of neighboring property owners. Second, several board members felt that Rodney had deliberately failed to obtain a DIPOA permit so that he could build his house wherever he wanted. Third, some board members felt that the consents from the Englunds' neighbors had been "coerced." One neighbor, Bay said, was "bribed" with a deck and the other had been "threatened" with suit such that the Englunds were "twisting arms" to get what they wanted.

Knizley's testimony was in line with the second reason given for the board's denial of the variance. He testified that he believed that what was "really going on" in the dispute was that Rodney knew that he had

to get a DIPOA permit and deliberately flouted the DIPOA's authority in violating the 90-foot setback requirement. As to evidence of coercion, Hayes testified that he was fine with the Englunds' house where it was so long as he still had a view of the sunset, and thus he had agreed to the extension of his deck. The Coales did not testify about their negotiations with the Englunds.

While suit was pending, Rodney also submitted an application to the DIPOA for a permit to build on Lot 23. That application was denied because of the setback violation.

Neighboring landowners near Lot 23 testified about the loss of sunset views resulting from the Englunds' violation of the 90-foot setback requirement. Hayes believed that the loss would affect his property's value, but, he said, until he attempts to sell, he could not say by how much. Three other neighbors near Lot 23 testified that the Englunds' house would cause them to lose sunset views for part of the year. Two believed that the violation would affect their property values, but neither testified by how much or stated that they had attempted to sell and had seen negative impacts as a result of the violation. One neighbor also believed that the setback requirement had value because it protected the

ecosystem. However, his primary complaint was that the Englunds should have to obey the covenants just like everyone else. One neighbor believed that allowing the setback violation would set a bad precedent and that future new construction would be built so as to further block views.

The DIPOA proposed an alternate floor plan for the Englunds' house on Lot 23 that would not violate the setback requirement. The proposed plan would reduce living space, eliminate a bedroom, and either eliminate one bathroom or change it from a full to a half bath. The proposal was made by the DIPOA vice president, who is also an engineer. He testified that the Englunds could reuse some of the lumber from the house to save costs in switching to the alternate plan. He stated that, from an engineering standpoint, the modifications "might not be difficult at all." He declined to testify about the costs of the proposed modifications.

Dyann testified that the house was currently 2,500 square feet and that the DIPOA proposal would reduce it to 1,800 square feet. She and Rodney testified that they estimated that the value of the completed house would thus be reduced by $300,000 to $350,000. Dyann believed

25

that the house would be harder to sell or rent because most people who come to Dauphin Island visit with big families and prefer more bedrooms and bathrooms. The reduction in space, she testified, would also interfere with their own plans for the house because their entire family could not stay there at one time.

Rodney testified that the DIPOA's proposed plan was not workable because it required changes to load-bearing walls, required reconfiguration of too many spaces, and created difficulties resulting from fortification requirements. He believed that materials, once removed, could not be reused. He and Dyann had prepared estimates showing details about the costs of tearing down the house and rebuilding back to their current stage of construction. The estimates showed that the cost to the Englunds would be $200,000 or more.

The Englunds acknowledged that they could rebuild with a second level to keep the square footage and number of bedrooms and bathrooms they desired. They believed, however, that doing so would be more expensive because the entire roof would have to be removed. Also, a second level would be less practical for them because of their age. Rodney was 71 years old at the time of trial. Rodney testified that, during the

course of the litigation, the house had deteriorated because of exposure to the elements and its unfinished state.

The Englunds presented evidence indicating that most decks, patios, and pools in their neighborhood extend beyond the 90-foot setback. Based on the plain language of the Silver Cay II covenant, they argue that those structures are prohibited and that the consistent violations have caused a change in the neighborhood, such that the covenant does not serve a legitimate purpose anymore. The DIPOA says that it interprets the covenant to prohibit only structures with roofs. Knizley testified that the neighborhood has no commercial development and that it remains a quiet, residential neighborhood. Thus, the DIPOA argues that there has been no change in the nature of the neighborhood.

### Standard of Review

" 'The ore tenus standard of review generally applies to judgments entered following a bench trial.' R & G, LLC v. RCH IV-WB, LLC, 122 So. 3d 1253, 1256 (Ala. 2013).

" 'Under the ore tenus standard of review, findings on disputed facts are presumed correct, and the trial court's judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust. Southside Cmty. Dev. Corp. v. White, 10 So. 3d 990, 991 (Ala. 2008). " ' " 'The presumption of correctness, however, is

27

rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.'"'" 10 So. 3d at 991-92 (quoting Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So. 2d 924, 929 (Ala. 2007), quoting in turn Waltman v. Rowell, 913 So. 2d 1083, 1086 (Ala. 2005), quoting in turn Dennis v. Dobbs, 474 So. 2d 77, 79 (Ala. 1985)).'

"Lawson v. Harris Culinary Enters., LLC, 83 So. 3d 483, 491 (Ala. 2011).

"Under the ore tenus standard, 'when a trial court makes no specific findings of fact, "this Court will assume that the trial judge made those findings necessary to support the judgment."' New Props., L.L.C. v. Stewart, 905 So. 2d 797, 799 (Ala. 2004) (quoting Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So. 2d 375, 378 (Ala. 1992)). 'Additionally, we note that "the ore tenus standard is inapplicable 'where the evidence is undisputed, or where the material facts are established by the undisputed evidence.' Salter v. Hamiter, 887 So. 2d 230, 234 (Ala. 2004)." Burkes Mechanical[, Inc. v. Ft. James-Pennington, Inc.], 908 So. 2d [905,] 910 [(Ala. 2004)]. In such cases, appellate review is de novo. Id.' Lawson, 83 So. 3d at 491."

Merchants Bank v. Head, 161 So. 3d 1151, 1153-54 (Ala. 2014).

As to the DIPOA's cross-appeal from the trial court's denial of its request for attorney fees: "Whether to award or to deny attorney fees lies within the sound discretion of the trial court. On appeal, the trial court's ruling on that question is subject to reversal only upon a showing of abuse

28

of discretion." <u>Battle v. City of Birmingham</u>, 656 So. 2d 344, 347 (Ala. 1995).

Analysis

I. The Appeal (Case No. SC-2024-0414)

On appeal, the defendants argue that the trial court erred by failing to apply their affirmative defenses to preclude enforcement of the restrictive covenants against them. Alternatively, they argue that the trial court erred by failing to apply its conclusion that the restrictive covenants should be enforced to require the DIPOA also to enforce them against the Coales.

The permanent injunction sought by the DIPOA is based in equity.

> "'"To be entitled to a permanent injunction, a plaintiff must demonstrate success on the merits, a substantial threat of irreparable injury if the injunction is not granted, that the threatened injury to the plaintiff outweighs the harm the injunction may cause the defendant, and that granting the injunction will not disserve the public interest."
>
> "'<u>TFT, Inc. v. Warning Sys., Inc.</u>, 751 So. 2d 1238, 1242 (Ala. 1999), overruled on another point of law, <u>Holiday Isle, LLC v. Adkins</u>, 12 So. 3d 1173 (Ala. 2008).'"

Walden v. ES Capital, LLC, 89 So. 3d 90, 105 (Ala. 2011) (quoting

Sycamore Mgmt. Grp., LLC v. Coosa Cable Co., 42 So. 3d 90, 93 (Ala.

2010)).

Regarding permanent injunctions involving restrictive covenants,

we have recently explained:

> "Our Court has previously recognized that, as a general matter, 'restrictive covenants are not favored in the law and will therefore be strictly construed by this Court.' Lange v. Scofield, 567 So. 2d 1299, 1301 (Ala. 1990). 'All doubts must be resolved against the restriction and in favor of free and unrestricted use of the property.' Id.
>
> "However, when the language of a restrictive covenant is not 'of doubtful meaning [or] ambiguous,' the language of that covenant 'is entitled to be given the effect of its plain and manifest meaning.' Laney v. Early, 292 Ala. 227, 231-32, 292 So. 2d 103, 107 (1974). 'If "there is no inconsistency or ambiguity within a restrictive covenant, the clear and plain language of the covenant is enforceable by injunctive relief."' Hipsh v. Graham Creek Estates Owners Ass'n, 927 So. 2d 846, 848 (Ala. Civ. App. 2005) (quoting Carpenter v. Davis, 688 So. 2d 256, 258 (Ala. 1997)). That proposition of law takes precedence over the disfavor that our Court has previously shown toward restrictions of the use of land. Laney, 292 Ala. at 231, 292 So. 2d at 106-07.
>
> "In Tubbs v. Brandon, 374 So. 2d 1358, 1361 (Ala. 1979), this Court stated:
>
>> "'When a restrictive covenant is broken, ... an injunction should be issued because the mere breach of the covenant is a sufficient basis for interference by injunction. The right to enjoin

30

> such a breach will not depend upon whether the covenantee will be damaged by the breach. <u>Reetz v. Ellis</u>, 279 Ala. 453, 186 So. 2d 915 (1966).'"

<u>Cole v. Davis</u>, 383 So. 3d 646, 653 (Ala. 2023) (emphasis omitted).

The DIPOA asserts that defendants have violated two restrictive covenants: the 90-foot setback requirement of the Silver Cay II restrictive covenants and the requirement for DIPOA approval incorporated into those covenants from the green sheets.[3] Both restrictive covenants are unambiguous. Moreover, the evidence is undisputed that the Englunds have built the house on Lot 23 beyond the 90-foot setback and that they did not obtain approval from the DIPOA before beginning construction. Thus, the restrictive covenants are enforceable by injunctive relief. The defendants do not challenge these points on appeal.

---

[3]On appeal, the defendants argue that the document the DIPOA submitted as the "green sheet" was not authenticated and thus has not been proved to be the recorded restrictive covenants applicable to Lot 23. <u>See</u> note 2, <u>supra</u>. The defendants assert this argument solely in reply to the DIPOA's cross-appeal about its attorney fees. The DIPOA has moved to strike that portion of the defendants' reply brief. Because the defendants do not otherwise challenge the DIPOA's authority to enforce the Silver Cay II covenants or its authority to issue permits, we need not address the motion to strike as it pertains to the arguments asserted in the defendants' appeal.

31

Instead, the defendants argue on appeal that the trial court erred by failing to apply their affirmative defense that the imposition of a permanent injunction against the Englunds would cause them great hardship that outweighs any benefit of the restrictive covenant to the DIPOA. We refer to this defense as "the relative-hardship test." Among other arguments, the defendants raised the applicability of the relative-hardship test in their posttrial brief. As noted above, although the trial court's judgment acknowledged that the defendants had asserted affirmative defenses, it did not explicitly address the relative-hardship test in its judgment. Accordingly, the trial court appears to have implicitly rejected it.

This Court recently summarized the relative-hardship test as follows:

> "Although, as noted earlier, the breach of a restrictive covenant is, by itself, enough to warrant the issuance of an injunction, in Lange [v. Scofield, 567 So. 2d 1299 (Ala. 1990),] this Court stated that enforcement of covenants running with land '"is governed by equitable principles, and will not be decreed if, under the facts of the particular case, it would be inequitable and unjust."' 567 So. 2d at 1302 (quoting 20 Am. Jur. 2d Covenants, Conditions & Restrictions § 313 (1965)).
>
> "....

"If '"the restrictive covenant has ceased to have any beneficial or substantial value"' or '"the defendant will be subject to great hardship or the consequences would be inequitable,"' a court, applying equitable principles, of equity will not enforce the covenant. <u>Id.</u> (citation omitted).

"In <u>Lange</u>, this Court explained:

"'"The equitable enforcement of a restriction can be invoked only for the purpose of protecting the benefit which it was the object of the covenant to afford. If the restrictive covenant has ceased to have any beneficial or substantial value to the ... property, it can form no ground for equitable relief .... [I]f the defendant will be subject to great hardship or the consequences would be inequitable, relief will be denied."'

"<u>Id.</u> (citation omitted)."

<u>Cole</u>, 383 So. 3d at 653-54.

Before considering any hardship to the Englunds caused by the imposition of the trial court's permanent injunction, we must first address Rodney's knowledge of the restrictive covenants at issue. The DIPOA rightly argues that, having built houses on Dauphin Island previously, Rodney had actual knowledge of the requirement to obtain the DIPOA's approval before beginning construction. Thus, the DIPOA insists that, by failing to obtain a DIPOA permit, the Englunds deliberately sought to flout and undermine the DIPOA's authority.

33

Based on the ore tenus standard of review, the DIPOA argues that the trial court made a credibility determination on this issue regarding Englunds' motives that is entitled to deference.

Before this Court's decision in <u>Cole</u>, <u>supra</u>, the Court of Civil Appeals had used evidence of a party's knowledge of a restrictive covenant, whether actual or constructive, as a reason to deny application of the relative-hardship test.  <u>See</u>, <u>e.g.</u>, <u>Grove Hill Homeowners' Ass'n v. Rice</u>, 90 So. 3d 731, 739 (Ala. Civ. App. 2011); <u>Maxwell v. Boyd</u>, 66 So. 3d 257 (Ala. Civ. App. 2010).  Those decisions indicating that knowledge could preclude consideration of the parties' relative hardships were based on application of the clean-hands doctrine.  <u>See</u> <u>Grove Hill</u>, 90 So. 3d at 739; <u>Maxwell</u>, 66 So. 3d at 737.  Thus, we will examine the clean-hands doctrine as it relates to the facts of this case.

<u>A. The Clean-Hands Doctrine</u>

In <u>Cole</u>, this Court explained that a party's knowledge is merely one factor for consideration in applying principles of equity to balance the relative hardships between the parties.

> "[T]his Court has not developed or applied a hard and fast rule preventing a party from relying on the relative-hardship defense in situations in which that party violated a covenant of which it had notice.  Instead, a party's knowledge --

constructive or actual -- of a restrictive covenant should simply be one factor for a trial court's consideration in determining whether the resultant harm from enforcement of a restrictive covenant 'would be considerably disproportionate to the benefit received by the landowner seeking enforcement' of the covenant. Grove Hill, 90 So. 3d at 737. See, e.g., id. at 742 (Bryan, J., dissenting) ('I would hold that a trial court should consider a party's knowledge of a restrictive covenant as a factor in applying the relative-hardship test rather than holding that such knowledge precludes the application of the test.'). Indeed, under virtually every circumstance, a property owner would have at least constructive notice of a recorded restrictive covenant, and thus the bright-line rule adopted by the Court of Civil Appeals would read the relative-hardship defense out of existence."

Cole, 383 So. 3d at 654-55.

Thus, in relevant part, Cole stands for the proposition that a party's knowledge of a restrictive covenant does not, as matter of law, foreclose that party from invoking the relative-hardship test as a defense to a claim seeking permanent injunctive relief. Put another way, such knowledge alone does not demonstrate unclean hands as a matter of law so as to prevent a balancing of the factors under the relative-hardship test.

In J & M Bail Bonding Co. v. Hayes, 748 So. 2d 198, 199 (Ala. 1999), we explained the following regarding the clean-hands doctrine:

"This Court has recognized that one 'who seek[s] equity must do equity' and 'one that comes into equity must come

35

with clean hands.' Levine v. Levine, 262 Ala. 491, 494, 80 So. 2d 235, 237 (1955). The purpose of the clean hands doctrine is to prevent a party from asserting his, her, or its rights under the law when that party's own wrongful conduct renders the assertion of such legal rights 'contrary to equity and good conscience.' Draughon v. General Fin. Credit Corp., 362 So. 2d 880, 884 (Ala. 1978). The application of the clean hands doctrine is a matter within the sound discretion of the trial court. Lowe v. Lowe, 466 So. 2d 969 (Ala. Civ. App. 1985)."

In Weaver v. Pool, 249 Ala. 644, 648, 32 So. 2d 765, 768 (1947), this Court stated:

"[T]he [clean-hands] maxim refers to willful misconduct rather than merely negligent misconduct and must be morally reprehensible as to known facts. Furthermore, equity will consider the conduct of the adversary, the requirements of public policy and the relation of the misconduct to the subject matter of the suit and to defendant. 30 C.J.S., Equity, § 98."

See also Retail Devs. of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So. 2d 924, 932 (Ala. 2007) (" '[T]he doctrine of unclean hands … finds expression in specific acts of willful misconduct'" that are "'morally reprehensible as to known facts.' Sterling Oil of Oklahoma, Inc. v. Pack, 291 Ala. 727, 746, 287 So. 2d 847, 864 (1973) (citing Weaver v. Pool, 249 Ala. 644, 32 So. 2d 765 (1947)).").

Thus, regarding whether the defendants can invoke the relative-hardship test as a matter of equity under the clean-hands doctrine, the

question presented is not simply whether Rodney had knowledge of the restrictive covenants at issue or even whether he engaged in negligent misconduct. Instead, the question is whether the defendants' actions "r[o]se to the level of morally reprehensible, willful misconduct." Retail Devs., 985 So. 2d at 932. Moreover, the DIPOA's conduct and its relation to the subject matter of the action are also relevant to the clean-hands inquiry. See Weaver, 249 Ala. at 648, 32 So. 2d at 768.

In considering the clean-hands doctrine, we first note that the trial court's judgment did not expressly find that the defendants had unclean hands. However, we will evaluate the evidence presented to determine whether it could have supported such an implicit determination by the trial court.

As noted above, Rodney testified that he asked the Town's permit clerk whether it was necessary for him to deliver materials separately to the DIPOA. Rodney testified that she stated that the Town would deliver his materials to the DIPOA and that the DIPOA would be in touch with him. Although the DIPOA notes that the trial court could have disbelieved Rodney's testimony in this regard, we also note that the DIPOA did not present evidence that conflicted with Rodney's testimony.

Indeed, other evidence confirmed Rodney's testimony. The head of the Town's permit department testified that it was, in fact, Town policy at the time to collect two sets of plans from applicants, one for the Town and one for the DIPOA. He also stated that it was possible that a permit clerk had told Rodney that the Town would send a copy of his permit application to the DIPOA.

On appeal, the parties argue over the validity of the one-stop agreement. The defendants maintain that, by the terms of the one-stop agreement, the Town and the DIPOA each had duties under the agreement -- the Town to deliver the Englunds' application and the DIPOA to pick up their application -- thus relieving the Englunds of any further responsibility to obtain the DIPOA's approval. The DIPOA maintains that the one-stop agreement was not followed consistently by it or the Town, was a "gentlemen's agreement" at best, and that the Town had breached the agreement, thus relieving the DIPOA of any responsibility to perform.

We find neither argument entirely persuasive. First, the Town's breach identified by the DIPOA was its decision not to withhold issuance of its own permits based on violations of restrictive covenants enforceable

38

by the DIPOA. That requirement does not appear in the most recent 1997 version of the one-stop agreement made part of the record in this case. Thus, the DIPOA has shown no breach of that agreement by the Town. Second, the 1997 agreement requires termination by written notice, which it is undisputed that neither the Town nor the DIPOA had ever provided. Finally, regardless of how well they did so, both the Town and the DIPOA continued until the time of trial to operate according to the terms of the agreement, the Town collecting plans and applications for the DIPOA and the DIPOA making arrangements to receive them regularly. Thus, the one-stop agreement did impose responsibilities on both the Town to collect information from the Englunds and the DIPOA to retrieve and review that information within 14 days.

That both the Town and the DIPOA failed in these responsibilities is significant. However, the one-stop agreement did not wholly relieve the Englunds of responsibility to ensure that they obtained a DIPOA permit, as the defendants suggest. Nothing in the one-stop agreement removes the requirement for DIPOA approval before property owners begin construction.

However, we conclude that the totality of the evidence presented regarding the Englunds' application to the Town and the history of the one-stop agreement does not support a determination that the defendants' actions "r[o]se to the level of morally reprehensible, willful misconduct." Retail Devs., 985 So. 2d at 932. Even if the relevant evidence presented would support a conclusion that Rodney had acted carelessly and without sufficient diligence to obtain the DIPOA's approval before beginning construction and had, therefore, engaged in negligent misconduct, such misconduct is insufficient to support a finding of unclean hands. See Weaver, 249 Ala. at 648, 32 So. 2d at 768

Regarding Rodney's subsequent conduct, we note that Rodney testified that he did have windows and doors installed in the house, which, he said, were delivered on the day he received the DIPOA's stop-work order. However, he explained that he did so to prevent loss of the materials and otherwise stopped work on the house. The DIPOA did not present evidence conflicting with this explanation. After the DIPOA filed suit, Rodney asked the Court's permission to proceed with limited additional work to prevent damage to the house. The DIPOA conceded, and the trial court granted that permission. Otherwise, the defendants

have complied with DIPOA's stop-work order, such that the house has deteriorated during the progress of the court proceedings.

The DIPOA argues on appeal that the Englunds intended to build wherever they wanted on Lot 23, regardless of any covenants enforced by the DIPOA. This certainly was the speculation of the DIPOA's own witnesses about Rodney's motives. However, they did not testify to anything they observed Rodney say or do that supported their opinions beyond the bare fact that he had knowledge that the DIPOA required an application. Thus, no other evidence shows that the Englunds' motive was to purposely and willfully violate the Silver Cay II setback requirement.

Moreover, the testimony of Knizley and Bay indicates that they were aware of the ongoing construction on Lot 23, for which it is undisputed the DIPOA had not given prior approval. Therefore, the defendants' construction activities were not hidden or concealed from the DIPOA and the DIPOA did not immediately issue a stop-work order. In short, we conclude that the evidence presented does not support a determination that the defendants' actions in constructing the Englunds' house before seeking a variance from the DIPOA "r[o]se to the level of

41

morally reprehensible, willful misconduct." Retail Devs., 985 So. 2d at 932. Accordingly, based on the evidence presented, the trial court could not have properly concluded that the defendants were barred by the clean-hands doctrine from invoking the relative-hardship test in defense of the DIPOA's action seeking a permanent injunction. Although, as already noted, the trial court's judgment did not expressly make such a determination, to the extent that it did so implicitly, we conclude that its judgment in that regard is palpably erroneous or manifestly unjust. See Merchants Bank, 161 So. 3d at 1154.

### B. Breach Alone as a Basis for Permanent Injunction

Briefly, we also note the DIPOA's reliance on Tubbs v. Brandon, 374 So. 2d 1358 (Ala. 1979), cited by this Court in Cole, for the proposition that a mere breach of a restrictive covenant provides a sufficient basis for the issuance of a permanent injunction. As quoted in Cole, the Tubbs decision had explained:

> " 'When a restrictive covenant is broken, ... an injunction should be issued because the mere breach of the covenant is a sufficient basis for interference by injunction. The right to enjoin such a breach will not depend upon whether the covenantee will be damaged by the breach. Reetz v. Ellis, 279 Ala. 453, 186 So. 2d 915 (1966).' "

Cole, 383 So. 3d at 653 (emphasis added in Cole).

42

This statement in <u>Tubbs</u> describes the burden on the party seeking enforcement of a restrictive covenant. Thus, under the second prong of the requirements for obtaining a permanent injunction, the party seeking enforcement of a restrictive covenant need not show actual damage by the breach; the breach in and of itself is sufficient to satisfy that element. <u>See</u> <u>Walden</u>, 89 So. 3d at 105 ("'"To be entitled to a permanent injunction, a plaintiff must demonstrate [1] success on the merits, [2] a substantial threat of irreparable injury if the injunction is not granted, [3] that the threatened injury to the plaintiff outweighs the harm the injunction may cause the defendant, and [4] that granting the injunction will not disserve the public interest."'")(Citations omitted)).

However, as already noted above, the <u>Cole</u> Court also clearly stated:

> "Although, as noted earlier, the breach of a restrictive covenant is, by itself, enough to warrant the issuance of an injunction, in <u>Lange [v. Scofield</u>, 567 So. 2d 1299 (Ala. 1990),] this Court stated that enforcement of covenants running with land '"is governed by equitable principles, and will not be decreed if, under the facts of the particular case, it would be inequitable and unjust."' 567 So. 2d at 1302 (quoting 20 Am. Jur. 2d <u>Covenants, Conditions & Restrictions</u> § 313 (1965))."

383 So. 3d at 653.

43

Thus, the affirmative defense based on relative hardship is a separate question that takes into consideration harm caused to the defendant and, thus, more closely relates to the third prong of the requirements for a permanent injunction. See Grove Hill, 90 So. 3d at 741 (Bryan, J., dissenting) ("[T]he relative-hardship test is very similar to the third element of the permanent-injunction standard ...."). As a matter of equity, the Court must ask if the benefit that the plaintiff might receive by effectuating the intended purpose of the restrictive covenant at issue outweighs the harm that permanent injunctive relief will cause to the defendant. See Cole, supra, and Lange v. Scofield, 567 So. 2d 1299 (Ala. 1990). Thus, the defendants' breach of the pertinent restrictive covenants alone does not, in and of itself, satisfy all the required elements for obtaining a permanent injunction. Consequently, we will proceed to examine the relative-hardship test under the facts of this case.

C. The Relative-Hardship Test

As noted, although the trial court's judgment acknowledged that the defendants had asserted affirmative defenses, it did not expressly address the relative-hardship test. Accordingly, it appears that the trial court implicitly rejected it. Therefore, we must evaluate whether the

evidence presented could have supported such an implicit determination by the trial court.

In Cole, we stated the following regarding the relative-hardship test:

> "'[I]f, upon a balancing of the equities, a court determines that the harm resulting to one landowner from the enforcement of a restrictive covenant would be considerably disproportionate to the benefit received by the landowner seeking enforcement, a court may decline to afford the landowner seeking enforcement the equitable relief of an injunction to redress a breach of the restrictive covenant.'
>
> "Grove Hill Homeowners' Ass'n v. Rice, 90 So. 3d 731, 737 (Ala. Civ. App. 2011). We note, however, that the relative-hardship defense is an affirmative one, and, thus, the burden is on the party asserting the defense."

Cole, 383 So. 3d at 654. Thus, we first consider the evidence presented regarding the harm caused to the Englunds by the enforcement of the restrictive covenants at issue and then balance that harm against the benefits afforded to the DIPOA by such enforcement.

### 1. Harm to the Englunds

The defendants presented evidence indicating that tearing down the house on Lot 23 and rebuilding it to its current state of construction would cost in excess of $200,000. They also presented evidence indicating

45

that reducing the square footage, to the degree proposed by the DIPOA, would interfere with the Englunds' intended use of the house as a family gathering place or a vacation rental. The Englunds estimated that the reduction in square footage would reduce the value of the completed house by approximately $350,000. To rebuild with a second level would cost more than $200,000 and would interfere with the Englunds' intended purpose of having one level for ease of use as they grow older.

Notably, the DIPOA's vice president, who was also an engineer, testified that, from an engineering standpoint, making the modifications suggested by the DIPOA "might not be difficult at all." However, the DIPOA did not present evidence contesting the Englunds' monetary estimates.

Even if the trial court determined that the Englunds' had overestimated the costs of bringing the house into compliance with the setback requirement, it is undisputed that doing so will require modifications to alter the existing structure. The resulting harm from doing so must be weighed against the benefits to the DIPOA that the restrictive covenants were allegedly intended to protect.

2. Benefits to the DIPOA

As noted above, the DIPOA has identified two restrictive covenants and corresponding benefits that the covenants were allegedly designed to protect. We consider each in turn, remaining mindful of the following principles:

"Concerning the construction of restrictive covenants, we have said:

"'[A]ll doubts must be resolved against the restriction and in favor of free and unrestricted use of property. However, effect will be given to the manifest intent of the parties <u>when that intent is clear</u> and the restrictions are confined to a lawful purpose within reasonable bounds, and rights created by covenants have not been relinquished or otherwise lost. <u>Wisneiwski v. Starr</u>, 393 So. 2d 488 (Ala. 1980). Furthermore, <u>restrictive covenants are to be construed according to the intent of the parties in the light of the terms of the restriction and surrounding circumstances known to the parties</u>. <u>Kennedy v. Henley</u>, 293 Ala. 657, 309 So. 2d 435 (1975).'

"<u>Hines v. Heisler</u>, 439 So. 2d 4, 5-6 (Ala. 1983)."

<u>Ex parte Odom</u>, 254 So. 3d 222, 227 (Ala. 2017)(emphasis added).

a. The Setback Requirement

As to the Silver Cay II 90-foot setback requirement, the intended benefit is unclear. No witness remembered the developer's intent at the

time the Silver Cay II setback requirement was adopted. The DIPOA's witnesses supposed the purpose was to preserve views for neighboring houses. The defendants suggested it was to keep houses a safe distance from the water line.

Neighbors who testified stated that the Englunds' house, as it stands, would block their sunset views for part of the year. No neighbor estimated any value for the loss of those views. Hayes, an immediate neighbor of the Englunds, stated that he believed the value of his house would be reduced because of the lost views, although, he said, he could not provide and amount of the reduced value until he attempted to sell his house. Personally, he was fine with the Englunds' placement of their house, so long as his deck was extended for him to maintain his view.

The DIPOA argues that the views of the Englunds' neighbors are valuable and protectable interests. It cites Lange v. Scofield, 567 So. 2d 1299 (Ala. 1990). However, this Court's opinion in that case did not address neighboring views at all and instead reviewed a covenant dealing with the density of construction in a neighborhood. This Court instead addressed the issue of neighboring views in Stewart v. Secor Realty &

Investment Corp., 667 So. 2d 52 (Ala. 1995), and in Gulf House Ass'n v.

Town of Gulf Shores, 484 So. 2d 1061 (Ala. 1986).

In Stewart, this Court considered an action by property owners

against the successor entity to the developer of their subdivision; the

action concerned the construction of a house adjacent to the plaintiffs'

property.

> "The [plaintiffs] complain[ed] that the [neighboring] house
> block[ed] the view from the front windows in their living room
> and cause[d] their house to be less appealing from the street.
> The [plaintiffs] also claim[ed] that the [neighborhing] house
> [wa]s too large for the lot upon which it s[at]. According to the
> [plaintiffs], the position of the [neighboring] house reduce[d]
> the value of their house in an amount between $20,000 and
> $100,000."

Stewart, 667 So. 2d at 54.

The Stewart Court noted that construction of the neighboring house

had complied with setback requirements and restrictive covenants

pertaining to the size of the house and had been approved by the design-

review committee. Regarding the plaintiffs' argument pertaining to their

loss of view, the Stewart Court stated:

> "This Court has addressed the issue whether a property
> owner is entitled to a view. In Gulf House Association, Inc. v.
> Town of Gulf Shores, 484 So. 2d 1061 (Ala. 1986), a group of
> condominium owners sought to enjoin the owner of adjacent
> land from building condominiums because the proposed

construction would destroy the view from the plaintiffs' land. This Court held:

> "'The residents of Gulf House have no legal entitlement to a view across the Waters property. In <u>Ray v. Lynes</u>, 10 Ala. 63 (1846), the court said:
>
>> "'"[O]ne who erects a house in a city or town, on the margin of his lot, with a window opening upon the lot of an adjoining proprietor, does not thereby acquire such a right to the use of his window, as to deprive the adjoining proprietor of the right to build on his lot, in any manner his judgment, or fancy may dictate.... [I]t was the folly of the plaintiff to construct his house as to be dependent on the adjoining proprietor, for light and air."'

"484 So. 2d at 1063-64."

667 So. 2d at 54-55.

The <u>Stewart</u> Court went on to analyze the facts of that case as follows:

> "The [plaintiffs] argue that <u>Gulf House</u> is distinguishable from the present case because <u>Gulf House</u> involved only the right to a view, whereas the [plaintiffs] are seeking an award of damages for a diminution in value that they allege resulted from the design review committee's failure to enforce the covenants and restrictions regarding the aesthetic compliance and harmonious blending of houses built on adjoining lots in this high-value development. This, under the circumstances alleged and the evidence presented, is a distinction without a difference. The [plaintiffs] complain

that the placement of the [neighboring] house diminishes the 'curb appeal' of their house, because the view of the [plaintiffs]' house is partially blocked by the [neighboring] house as one approaches from the west. This amounts to an assertion that the [plaintiffs] are entitled to a view of their property from the street by prospective purchasers; this is even less a property right than that asserted in Gulf House.

"Even within the terms of the broad statements in the restrictive covenants -- to the effect that the covenants are 'for the purpose of enhancing and protecting the value, desirability and attractiveness' of the properties and that the committee is to consider aesthetics, the suitability of the proposed construction, and 'the harmony thereof with the surroundings and the effect of the building or other structure as planned, on the outlook from the adjacent or neighboring property' -- the [plaintiffs] have not presented substantial evidence of breach of contract or negligence."

667 So. 2d at 55.

Stewart is different from the present case because that case involved different causes of action and the construction at issue in that case had complied with the restrictive covenants at issue. However, Stewart is also similar to this case in that one alleged benefit of the relevant restrictive covenants in both cases is the preservation of a view.

In short, Stewart clearly articulates the general rule under Alabama law that property owners have no legal right to a view. In the present case, we do not hold that a right to a view can never be protected through the use of restrictive covenants burdening land. However, in

51

light of the ambiguity in the present case regarding the original purpose of the setback requirement; the lack of specific evidence regarding a diminution in value to surrounding property owners resulting from the defendants' violation of the setback requirement; the acquiescence to the defendants' construction by the Englunds' adjacent neighbor; and of the recommendation to approve the Englunds' variance by the DIPOA's own architectural committee, we conclude that the harm to the Englunds caused by a permanent injunction is considerably disproportionate to the benefit received by the DIPOA as to the violation of the Silver Cay II setback requirement.

### b. The DIPOA Approval Requirement

Regarding the defendants' violation of the restrictive covenant requiring DIPOA approval before beginning construction, the benefit protected by that covenant is for all property owners on Dauphin Island, not the DIPOA itself. At the time the DIPOA was granted its authority to enforce restrictive covenants, the Town did not exist. Thus, the DIPOA provided a means of enforcement where none had existed and enforcement that would be uniform across Dauphin Island. The Town now enforces its own ordinances, not restrictive covenants.

Thus, the DIPOA's exercise of its authority still provides a benefit to property owners on Dauphin Island. Importantly, according to its green sheets, any failure by the DIPOA to enforce a restrictive covenant does not waive the DIPOA's authority to do so in the future. See also Dauphin Island Prop. Owners Ass'n v. Kuppersmith, 371 So. 2d 31, 32, 34 (Ala. 1979) (noting that 1953 restrictions provide that the DIPOA's failure to enforce any restriction does not waive its right to enforce thereafter and holding that the DIPOA's acquiescence in violation of one restriction did not estop its enforcement of other restrictions).

The reasons given by members of the DIPOA board who testified showed an intent to punish the Englunds for their failure to obtain a DIPOA permit before beginning construction and thus flouting the DIPOA's authority. DIPOA witnesses testified to their fear that the Englunds' failure to obtain a permit will "set a bad precedent" and lead others to deliberately do so in the future. However, the DIPOA still retains authority to enforce restrictive covenants because its failure to do so with regard to a particular violation does not deprive the DIPOA of any power to enforce them in the future.

Moreover, at trial, Bay testified that he was aware of the construction on Lot 23 in August 2022 but did not obtain a list of permits that the Town had issued, although he stated that he could have. At trial, Bay testified that he had begun checking that list regularly as a result of the circumstances giving rise to this case. Therefore, we conclude that any benefit to the DIPOA regarding precedent and future enforcement of its restrictive covenants is also considerably disproportionate to the harm resulting to the Englunds from having to tear down, reconfigure, and rebuild their house.

### D. Conclusion

Because the evidence presented in this case demonstrates that any benefit received by the DIPOA through a permanent injunction is considerably disproportionate to the harm resulting to the Englunds from having to tear down, reconfigure, and rebuild their house, we conclude that the trial court's failure to apply the relative-hardship test to deny the DIPOA's request for a permanent injunction was palpably erroneous or manifestly unjust. See Merchants Bank, 161 So. 3d at 1154. Because we reverse the trial court's judgment and render a judgment in the defendants' favor on this basis, we pretermit consideration of the

54

defendants' alternative argument regarding alleged changes in the neighborhood. Moreover, we need not address the trial court's denial of the Englunds' counterclaim, which the Englunds solely asserted as an alternative basis for relief if their affirmative defenses were denied.

II. The Cross-Appeal (Case No. SC-2024-437)

In its cross-appeal, the DIPOA argues that the trial court erred in failing to grant its requests for attorney fees. However, because we have reversed the trial court's judgment and rendered a judgment in favor of the defendants, the cross-appeal is moot and need not be addressed. See American Petroleum Equip. & Constr. Inc. v. Fancher, 708 So. 2d 129, 133 (Ala. 1997). Likewise, we need not resolve the DIPOA's motion to strike certain arguments made by the defendants as to the DIPOA's authority to receive attorney fees under the green sheets, and we have denied that motion as moot by separate order.

SC-2024-0414 -- REVERSED AND JUDGMENT RENDERED.

SC-2024-0437 -- APPEAL DISMISSED.

Stewart, C.J., and Shaw, Wise, Sellers, Mendheim, McCool, and Lewis, JJ., concur.

Cook, J., concurs specially, with opinion.

COOK, Justice (concurring specially).

I concur fully with the main opinion. I write specially, however, to emphasize for the Bench and the Bar that cases involving restrictive covenants, like the case now before us, must be judged on the unique set of facts presented in each case. See Lange v. Scofield, 567 So. 2d 1299, 1302 (Ala. 1990) (quoting 20 Am. Jur. 2d Covenants, Conditions, & Restrictions § 313, at 876-77 (1965)) ("'Broadly speaking, the enforcement of building restrictions is governed by equitable principles, and will not be decreed if, under the facts of the particular case, it would be inequitable and unjust ....'" (emphasis added)).

As explained thoroughly in the main opinion, the undisputed evidence shows, among other things, that Rodney G. Englund and Dyann K. Englund have built their vacation home on Lot 23 beyond the 90-foot setback requirement set forth in the Silver Cay II restrictive covenant. Although the purpose of this setback requirement is unclear, the witnesses for the Dauphin Island Property Owners Association ("the DIPOA") supposed that the purpose was to preserve views for neighboring houses.

This Court has previously addressed the issue of neighboring views

in <u>Stewart v. Secor Realty & Investment Corp.</u>, 667 So. 2d 52 (Ala. 1995), and has articulated the general rule under Alabama law that property owners have no legal right to a view. However, <u>Stewart</u> does not mean that a view could never be protected through a restrictive covenant. And the main opinion makes clear that it is not so holding here.

Rather, the unique facts of this case compel us to conclude that any benefit that may be created by the setback requirement for preserving neighboring views on Dauphin Island is considerably disproportionate to the harm caused to the Englunds by a permanent injunction. Among other things, ambiguity in the present case regarding the original purpose of the setback requirement; a lack of specific evidence regarding a diminution in value to surrounding property owners resulting from the Englunds' violation of the setback requirement; acquiescence to the Englunds' construction by their adjacent neighbors; and a recommendation to approve the Englunds' variance by the DIPOA's own architectural committee all indicate that the harm to the Englunds caused by a permanent injunction is considerably disproportionate to any such benefit <u>in this case</u>. A different set of facts very well could have yielded a different result here.

Because the unique facts in this case drive the outcome here, we must reverse the issuance of the injunction. It is for this reason that I concur with the main opinion.